UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHRIS DEMARINIS, individually and as guardian of DD**<br>1144 Cardinal Court<br>Bushkill, PA 18324<br><br>                            Plaintiff,<br><br>      v.<br><br>**ANTHEM INSURANCE COMPANIES, INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD**<br>4361 Irwin Simpson Road<br>Mason, OH 45040<br><br>and **ABC CORPORATIONS 1-10,**<br><br>                            Defendants. | Civil Action No.: 3:20-CV-713<br><br>**PENDING SEALING DECISION**<br><br><br>**FILED<br>SCRANTON**<br><br>APR 3 0 2020<br><br>PER _____<br>DEPUTY CLERK |

## COMPLAINT

Plaintiff Chris DeMarinis, individually and as guardian of DD, ("Mr. DeMarinis" or "plaintiff") by and through the undersigned counsel, Sherman, Silverstein, Kohl, Rose & Podolsky, P.A., by way of Complaint against defendant Anthem Insurance Companies, Inc. d/b/a Anthem Health Plans, Inc. t/a Anthem Blue Cross and Blue Shield ("BCBS" or "defendant"), hereby says, states, and avers as follows:

### INTRODUCTION

1.      This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et. seq.*, ("ERISA") and more particularly 29 U.S.C. § 1109 and § 1132(a)(1)(B).

2397828.1

2.    At all material times, Mr. DeMarinis was a qualified participant in a medical plan (the "Plan") issued by defendant under Group Number 0033099. See copy of Plan attached as Exhibit A.

3.    Mr. DeMarinis' minor son, DD, is a participant in the Plan through Mr. DeMarinis.

4.    The Plan is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this claim under 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331.

6.    This Court additionally has subject matter jurisdiction based on diversity of the parties, and the amount in controversy exceeds $75,000.00 as required under 28 U.S.C. § 1332(a)(2).

7.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, the breach for which relief is sought occurred in this district, and defendant regularly transacts business in this district.

## PARTIES

8.    Mr. DeMarinis is the father of DD and resides in Pennsylvania.

9.    Defendant is a licensed insurance company with its principal place of business in Mason, Ohio.

10.    Defendants ABC Corporations 1-10 are fictitious-name designations of one or more individuals, partnerships, corporations, subsidiaries and/or other entities which may become known through the course of discovery.

## FACTS COMMON TO ALL COUNTS

11.    Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth herein.

12.    DD was born on May 7, 2003.

13.    DD is a 16 year-old with a diagnosis of severe intellectual disability, Autism Spectrum Disorder, Disruptive Behavior Disorder, Obsessive-Compulsive Disorder, seizures, Macrocephaly, and Hypokinetic syndrome.

14.    He is nonverbal and has developmental delays.

15.    DD displays persistent and frequent self-injurious, aggressive, disruptive, destructive, and dangerous behaviors that have significantly worsened over the past year.

16.    The increase in frequency and intensity of maladaptive behaviors, particularly aggression and self-injury, places DD and others at risk of injury on a daily basis.

17.    DD displays severe aggression (punching, pinching, hair pulling, head butting, hitting, kicking, biting others, choking, bending others fingers backwards), self-injury (head banging, self- biting, punching, forceful dropping to knees, slamming knuckles of feet, bends back fingers), disruptive and destructive behaviors (biting objects, breaking objects, throwing items, climbing shelves, kicking walls, moving around in the car), elopement (running from caregivers, leaving the home, running away to escape demands), pica (eating of inedible objects such as nail polish, cleaning erasers, deodorant, paper), rumination, and noncompliance. These severe problem behaviors occur daily.

18.    While DD's problem behavior used to be more manageable, during the past year, caregivers and providers report that he now requires intensive management to prevent injury to others and himself.   As a result, DD presents significant risk of injury to himself and others.

19.   DD has caused significant physical injuries to himself and others.

20.   DD was attending an Extended School Year program where he was staffed 3:1 in which staff wore arm guards and chest plates to protect themselves from DD's aggression; despite this DD's 1:1 aide sustained a permanently damaged forearm muscle as a result of his bites. DD also received in-home behavioral services. His mother does not feel she can manage him in the community by herself and she can no longer safely handle him at home.

21.   DD's school implemented a behavior plan and a special "code" at the school such that when he becomes aggressive, extra staff members come to help implement the physical restraints or compression.

22.   DD has caused significant bruising to his face as a result of head banging and head hitting; his school sent him the emergency department on one occasion as a result of his worsening episodes of head banging, aggression and self-injury.

23.   DD's school frequently calls his mother to come pick him up early due to his outbursts and their inability to manage him safely.

24.   During transportation, DD requires a four-point harness and, even with the harness, he will attempt to kick his younger sister if she is in the vehicle.

25.   Unfortunately, DD's problem behavior did not respond to outpatient or school-based intervention.

26.   DD's severe problem behaviors place him and others at severe risk of injury on a daily basis; caregivers routinely sustain injuries and DD's family has had to lock every door in their home and cover the television with plexiglass and as well as remove any items from walls as DD would remove items to throw, destroy or use to conduct self-injurious behavior.

27.    DD's behavioral and medical providers have noted that his behavior has not responded adequately to available local outpatient behavioral treatment; each provider has noted that DD's behavior is too complex and dangerous to treat on an outpatient basis and that he requires a specialized, long-term inpatient hospitalization to effectively treat his maladaptive behaviors.

28.    DD's parents have tried numerous interventions for him with little or no success. Thus, they sought to take DD to Kennedy Krieger Institute ("KKI") for treatment at its world renowned inpatient Neurobehavioral Unit ("NBU").

29.    KKI has had enormous success in treating patients such as DD.  Historic outcome data collected by KKI show that 88% of patients achieve at least an 80% reduction in aggression, self-injury, property destruction, or other targeted behaviors and 86% of patients maintained behavior reductions in three and six month follow up examinations.

30.    Furthermore, 94% of parents and caregivers expressed satisfaction with the care provided by KKI.

31.    KKI concluded that the comprehensive multidisciplinary approach provided by KKI was medically necessary for DD to make significant progress with his maladaptive behaviors.

32.    On April 30, 2019, KKI issued an authorization request to defendant for funding to treat DD for a period of four months in the NBU in order for the NBU to assess DD's behaviors, develop an effective treatment, generalize the treatment across all settings and train care providers.

33.    DD was admitted to KKI on May 1, 2019.

34.    After only one week of treatment, on May 8, 2019, defendant issued a letter denying continuation of coverage and indicating that the requested services are not medically necessary after May 8, 2019.

35.    KKI submitted a Level One expedited appeal.

36.    On May 14, 2019, defendant issued a letter upholding the denial

37.    The primary reason for defendant's denial was that "After the treatment you got in the hospital you were no longer at a high risk for harm. You could have been treated without outpatient services."

38.    KKI thereafter submitted a Level Two Appeal in support of the position that, contrary to defendant's assertion, the medical necessity of DD's treatment at KKI did not end on May 8, 2019 and continued coverage is both medically necessary and imperative to his long-term success.

39.    KKI stated that DD continued to present significant risk of harm to both himself and others. From the date of denial, May 9, 2019, to May 24, 2019, he engaged in an average of 59 instances of self-injurious behavior, 39 instances of physical aggression, and 6 instances of destructive behaviors per day, totaling 104 behaviors per day.

40.    Thus, KKI determined that acceptable discharge criteria have not been met.

41.    Further, KKI provided detailed response negating any contention that the care provided by the NBU constitutes custodial care. In reality, the care being provided was rehabilitative. KKI explained as follows: "the goals [for DD's treatment] are to improve functioning so he will be able to participate in educational programming, and home and community life. Progress has been made in these efforts, but much more remains to be accomplished. Second, in light of the basic goals of custodial care, facilities providing such care often have one direct care staff person managing 4 to 6 residents, rudimentary nursing monitoring, and weekly or monthly monitoring by a physician. If interdisciplinary care is being provided, the team may meet monthly or even every six months. In contrast, on the NBU: a) [DD] is staffed 1:1 by direct care staff who collect detailed behavioral data during all waking hours, b) he is seen throughout the day by a

nurse to monitor his medical status, c) he participates in 3.5 hours of intensive behavior therapy sessions by a team of 3 therapists, d) he attends therapies, and d) is seen by a psychiatrist every day."

42.    On June 14, 2019, defendant issued a determination upholding the denial of continued coverage and indicating that "You were in the hospital because you were at a high risk for harm… Now we have new information from the hospital medical records plus letters.  We still do not think this is medically necessary for you.  We believe our first decision is correct for the following reason.  After the treatment you got in the hospital, you were no longer at a high risk for harm.  You could have been treated with outpatient services."

43.    KKI submitted a request for independent external review on July 9, 2019 in support of the position that the medical necessity of DD's treatment at KKI did not end on May 8, 2019, and continued coverage is both medically necessary and imperative to his long-term success.

44.    KKI reiterated its position that defendant's "denial does not align with the plethora of information provided below and all previous conference calls indicating that [DD] and others around [DD] remain at high risk of harm on a daily basis due to his severe behaviors, as evidence by the data and list of staff injuries since his admission."

45.    In fact, from May 8, 2019 through June 17, 2019, DD engaged in an average of 63 instances of self-injurious behavior, 29 instances of physical aggression, 6 instances of destructive behavior and 10 instances of elopement, totaling 108 behaviors per day.

46.    Further, from June 18, 2019 to July 8, 2019, DD engaged in an average of 66 instances of self-injurious behavior, 31 instances of physical aggression, 6 instances of destructive behavior, and 17 instances of elopement, totaling 120 behaviors per day.

47.    KKI additionally provided a list of staff injuries caused by DD, including bite to hand while attempting to transition; sprain to back while attempting to transition; grab and forceful bending backwards of hand and fingers while attempting to block head-banging; bite to arm while attempting to block elopement; bite to finger while attempting to manage outburst; and abrasion to eye while managing behavioral outburst.

48.    KKI additionally described the psychopharmacological treatment rendered in conjunction with the behavior treatment; including changes in medications and resulting reactions by DD.

49.    KKI also referenced the well-documented history of all outpatient and in-home services DD received prior to treatment at KKI resulted in no significant changes to his behavior.

50.    On September 3, 2019, a letter was issued by Advanced Medial Reviews (AMR) enclosing a two-paged Peer Reviewer Final Report by a physician "board certified in Psychiatry, Psychiatry Child & Adolescent, Sleep Medicine, Psychiatry with Expertise in Eating Disorders," a specialty with no relevance to the treatment at issue in contravention of 29 CFR 2560.503-l(h)(3)(iii), who upheld the decision that continued treatment in the NBU from May 8, 2019 forward was not medically necessary because "The patient was not noted to have any significant acute behavioral symptoms that are possible a change from baseline that required continued inpatient hospitalization as of 05/08/2019."

51.    Defendant's stated rationale for its denial is without merit.

52.    DD's behaviors were too complex and too severe to safely treat him unless intensive supports, such as those afforded during inpatient care, are available.

53.    There were several inaccurate statements made within the external review denial letter. Specifically, the Neurobehavioral Unit at KKI does not provide milieu, individual, or family therapy; rather, the program provides intensive behavioral assessment and treatment, following the principles of Applied

Behavior Analysis, for individuals with severe behavior disorders and intellectual disabilities. The purpose, focus, and delivery of service that KKI provides was clearly stated during and within the initial authorization documentation.

54.    Further, the contention by AMR that "Medications were optimized for adequate symptom control. The patient was reported to have no adverse side effects" is erroneous. Results from a blood panel immediately following admission, which were provided to defendant, showed that DD's platelet count was elevated to medically significant levels, requiring a need to decrease his valproic acid on 5/3/19 and again on 5/9/19. As DD had been on this medication for quite a while prior to his admission, for safety and health reasons, it was necessary to continue observing the effect that this significant decrease would have on his problem behavior.

55.    Despite defendant's appeal decision, KKI continued to treat DD until his discharge on October 24, 2019.

56.    On November 25, 2019, KKI contacted defendant to inquire about the status of the claim.

57.    Via a one-page letter dated January 10, 2020, defendant indicated that the denial decision was upheld without providing any further explanation or details.

## COUNT I

58.    Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth herein.

59.    Defendant's denial is without merit. Specifically, defendant's contention that DD's treatment at KKI from May 8, 2019 and beyond is not "medically necessary in this patient based on current medical literature and accepted standards of medical practice[,]" as set forth in the Peer Reviewer Final Report, fails to refer to any specific "current medical literature" or "standard of medical practice" on which its determination is based.

60.     Further, the contention that DD did not have behavioral symptoms that represented a change from baseline as of May 8, 2019 is without merit. Specifically, as of July 8, 2019, DD continued to exhibit an average of 120 instances of problem behaviors per day.

61.     The Plan defines "Medically Appropriate or Medically Necessary" as "Any generally accepted medical service or supply provided by, or under the supervision of, a licensed doctor that is required to diagnose or treat an illness or injury."

62.     In contrast, under the Plan "Custodial Care Services" are services "that do not require the skills of professionally trained medical personnel and are of a sheltering, protective or safeguarding nature … or to assist with the activities essential to daily living (such as walking, grooming, bathing, dressing, getting in or out of bed, toileting, eating, preparing food, or taking medications that can be self-administered). Custodial care is not meant to be curative or to provide medical treatment."

63.     Defendant's denial hinges on the erroneous determination that the services provided, after one week of treatment, were no longer medically necessary and DD was no longer at a high risk for harm, despite the medical records describing the numerous instances of self-harm and harm to others, among other things. Defendant, without explanation, wrongly concludes that DD could have been treated with outpatient services.

64.     The severity of DD's problem behavior and failure to respond to treatment on an outpatient basis are well documented and indisputable. Continued treatment at a higher level of care, such as the NBU, was clearly indicated.

65.     Despite providing ample medical records and support to overturn the denial, on September 3, 2019, a letter was issued by Advanced Medial Reviews (AMR) enclosing an the

cursory and repetitive Peer Reviewer Final Report which upheld the decision that continued treatment in the NBU from May 8, 2019 forward was not medically necessary.

66.    Thereafter, defendant's January 10, 2020 correspondence wrongfully upheld the denial decision without providing any further explanation or details.

67.    Defendant's denial of benefits for the period from May 8, 2019 through his discharge on October 24, 2019, was unsupported by substantial evidence, erroneous as a matter of law, not made in good faith and in violation of ERISA.

**WHEREFORE,** plaintiff demands the following: (a) that defendant cover the full cost and expenses of DD's treatment in the NBU program from May 8, 2019 to October 24, 2019, in the amount of $459,318.00; (b) that defendant be required to reimburse plaintiff for reasonable attorneys' fees and costs incurred in this action; and (c) imposition of such other and further penalties against defendant as deemed appropriate.

## COUNT II

68.    Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth herein.

69.    As stated above, plaintiff has taken all measures necessary to exhaust the administrative remedies under the Plan.

70.    Defendant erroneously denied Mr. DeMarinis' claim.

71.    The denial of the claim for benefits was unsupported by substantial evidence, erroneous as a matter of law, not made in good faith, and in violation of ERISA.

72.    Plaintiff is entitled to recover the reasonable attorneys' fees and costs of action pursuant to 29 U.S.C. § 1132(g).

WHEREFORE, plaintiff demands the following: (a) that defendant cover the full cost and expenses of DD's treatment in the NBU program from May 8, 2019 to October 24, 2019, in the amount of $459,318.00; (b) that defendant be required to reimburse plaintiff for reasonable attorneys' fees and costs incurred in this action; and (c) imposition of such other and further penalties against defendant as deemed appropriate.

                                          Respectfully submitted,

                      BY:

                                          SHERMAN, SILVERSTEIN, KOHL,
                                          ROSE & PODOLSKY, P.A.
                                          Alan C. Milstein
                                          308 Harper Drive, Suite 200
                                          Moorestown, NJ 08057
                                          Telephone: 856-662-0700
                                          Facsimile: 856-488-4744
                                          E-Mail: amilstein@shermansilverstein.com
                                          *Attorneys for Plaintiff*

DATE: April 24, 2020



Alan C. Milstein, Esquire
Direct Dial 856.661.2078
Direct Fax 856.488.4744
amilstein@shermansilverstein.com


April 24, 2020


**VIA REGULAR MAIL**
Clerk of Court
United States District Court – Middle District of Pennsylvania
U.S. District Courthouse
235 N. Washington Avenue
P.O. Box 1148
Scranton, PA 18501


RE:   **Chris DeMarinis, Individually and as guardian of DD v. Anthem Insurance**
      **Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield**
      United States District Court – Middle District of Pennsylvania
      **Case No.:**

Dear Sir or Madam:

      Enclosed please find an original and three copies of the Summons, Notice of a Lawsuit
and Request to Waive Service of Summons, Waiver of Service of Summons, Civil Cover Sheet,
Complaint and Plaintiff's Motion to File Under Seal with regard to the above referenced matter.
Please file the original of record with the Court, returning a time stamped copy in the envelope
provided.   A check in the amount of $400.00 is enclosed for filing same.

      Should you have any questions, please feel free to contact me directly.  Thank you for
your attention to this matter.

                         Very truly yours,

            SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
                       A Professional Corporation


                       ALAN C. MILSTEIN

ACM/jr
enc.


308 Harper Drive, Suite 200 • Moorestown, NJ 08057 • T: 856.662.0700 • F: 856.662.0165 • shermansilverstein.com
11 Bala Avenue • Bala Cynwyd, PA 19004 • T: 215.923.2513

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.

Court Name: District Court
Division: 3
Receipt Number: 333071066
Cashier ID: gangeli
Transaction Date: 04/30/2020
Payer Name: SHERMAN SILVERSTEIN KOHL

CIVIL FILING FEE
 For: SHERMAN SILVERSTEIN KOHL
 Case/Party: D-PAM-3-20-CV-000713-001
 Amount:        $400.00

Paper Check Conversion
 Check/Money Order Num: 43003
 Amt Tendered:  $400.00

Total Due:       $400.00
Total Tendered: $400.00
Change Amt:       $0.00

Only when bank clears the check or
verifies credit of funds is the fee
or debit officially paid or
discharged. A $53.00 fee will be
charged for returned checks.