### THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHRIS DEMARINIS, individually
and as guardian of D.D.,

      Plaintiff,

      v.

ANTHEM INSURANCE COMPANIES,
INC., d/b/a ANTHEM BLUE CROSS
AND BLUE SHIELD and ABC
CORPORATIONS 1-10,

      Defendant.

: CIVIL ACTION NO. 3:20-CV-713
: (JUDGE MARIANI)

**FILED
SCRANTON**

APR 1 0 2024

Per_____
DEPUTY CLERK

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court are cross-motions for summary judgment. Plaintiff Chris DeMarinis ("Plaintiff") filed a Motion for Summary Judgment (Doc. 33), as did Defendant Anthem Insurance Companies, Inc. ("Anthem") (Doc. 45). The underlying action arises under the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), specifically 29 U.S.C. §§ 1109 and 1132(a)(1)(B). Plaintiff filed the action after Defendant denied coverage for the cost of his son's treatment at the Kennedy Krieger Institute ("KKI") inpatient Neurobehavioral Unit ("NBU"). D.D., Plaintiff's minor son, has "a psychiatric disorder involving very serious behavioral dysfunction and a diagnosis of Stereotype Movement Disorder with Self-Injury, Disruptive Behavior Disorder, Autism Spectrum Disorder, Severe Intellectual Disability and Obsessive Compulsive Disorder."

(*See, e.g.*, Doc. 33-2 ¶ 8.)  With his Complaint (Doc. 1) and pending Motion (Doc. 33), Plaintiff requests that the Court require Defendant to cover the cost of D.D.'s treatment at KKI's NBU program from May 8, 2019, to October 24, 2019, in the amount of $459,318 and reimburse Plaintiff for the reasonable attorneys' fees and costs incurred in this action. (Doc. 1 at 11, Doc. 33 at 1.) Defendant asserts that summary judgement in its favor is warranted because it properly determined that D.D.'s continued treatment was not medically necessary and denied coverage on this basis. (*See, e.g.,* Doc. 47 at 1.) For the reasons that follow, the Court will grant Plaintiff's Motion in part and deny Defendant's motion.

## II. STATEMENT OF MATERIAL FACTS

In accordance with Local Rule 56.1 of the Middle District of Pennsylvania Rules of Court, Plaintiff has submitted a statement of material facts in support of his motion ("PSMF") as to which he submits there is no genuine issue for trial. (Doc. 33-1.) Defendant subsequently submitted its response to Plaintiff's submission ("DRPSMF") and additional material facts which it asserts are undisputed ("DSMF"). (Doc. 51 (Sealed).) Plaintiff then filed a response to Defendant's additional material facts ("PRDSMF"). (Doc. 53-1.) The following factual recitation represents the facts agreed upon by the parties, as well as the Court's supplementations drawn from the administrative record ("AR" or "D . . .") (Doc. 30

through 30-18 (Sealed)) where necessary. Except where expressly noted, the following facts of record are undisputed.[1]

At all material times, Plaintiff was a member of a medical plan sponsored by Siemens Corporation (the "Plan"). (PSMF ¶ 1.) Plaintiff's minor son, D.D., receives health coverage through the Plan. (PSMF ¶ 4.) Defendant Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield ("Defendant" or "Anthem") is a Claims Administrator for the Plan that processes claims and appeals. (PSMF ¶ 2.) Specifically, the Summary Plan Description ("Plan") states that

> [t]he Claims Administrator or Administration Committee, as applicable, has full and exclusive discretionary authority to interpret all provisions of the Plans for which it is designated with responsibility for determining appeals, to determine material facts and eligibility for benefits, and to construe the terms of the applicable Plan option. Interpretations and determinations made by the Claims Administrator or Administrative Committed, as applicable, with respect to the Plan option for which it is designated responsibility for determining appeals, will be final, conclusive and binding; unless it can be shown that the interpretation or determination was arbitrary and capricious.

(AR 198.)

The Plan requires that members have their non-emergency hospital admissions pre-certified by the Claims Administrator. (DMSF ¶ 109.) Benefits for hospital expenses "are not payable unless authorized in advance." (DSMG ¶ 110 (quoting AR 66).)

---

[1] The parties' statements of fact appropriately include references to the record. The Court has reviewed those references but, for the most part, does not repeat them here.

The Plan provides that "only Medically Appropriate services and supplies are covered under the Plan." (AR 98). "Medically Appropriate or Medically Necessary" is defined in the Plan as "[a]ny generally accepted medical service or supply provided by, or under the supervision of, a licensed doctor that is required to diagnose or treat an illness or injury." (AR 217.)

To determine "Medical Necessity," Defendant references and relies on the Milliman Care Guidelines ("MCG"). (DSMF ¶¶ 73, 80.)

The Summary Plan Description defines "Custodial Care" as

> Services that do not require the skills of professionally trained medical personnel and are of a sheltering, protective or safeguarding nature (including a stay in an institutional setting, at-home care or nursing services to care for you because of age or mental or physical condition) or to assist with the activities essential to daily living (such as walking, grooming, bathing, dressing, getting in or out of bed, toileting, eating, preparing food, or taking medications that can be self-administered). Custodial care is not meant to be curative or to provide medical treatment.

(AR 213.)

KKI's April 30, 2019, Authorization Request for funding to treat D.D. for a period of four months in the inpatient NBU included the following profile:

> [D.D. is] a 15-year-old male with a psychiatric disorder involving very serious behavioral dysfunction[.] [D.D.] is previously diagnosed with severe Intellectual Disability, Autism Spectrum Disorder, Disruptive Behavior Disorder not otherwise specified, Obsessive-Compulsive Disorder, seizures, and Macrocephaly Hypokinetic syndrome of childhood agitation. He is nonverbal with developmental delays. [D.D.] displays persistent and frequent self-injurious, aggressive, disruptive, destructive, and dangerous behaviors that have significantly worsened over the past year, particularly the past 8 months. The increase in frequency and intensity of maladaptive behaviors, particularly

4

aggression and self-injury, places [D.D.] and others at risk of injury on a daily basis. The [NBU] team evaluated [D.D.] and concluded that inpatient admission to the NBU is medically necessary as previous outpatient behavioral services to treat his severe problem behaviors have not been successful and the danger he presents to himself and others has persisted and increased.

Specifically, [D.D.] presents with severe aggression (punching, pinching, hair pulling, head butting, hitting, kicking, biting others, choking, bending others fingers backwards), self-injury (head banging, self biting, punching, forceful dropping to knees, slamming knuckles of feet, bends back fingers), disruptive and destructive behaviors (biting objects, breaking objections, throwing items, climbing shelves, kicking walls, moving around in the car), elopement (running from caregivers, leaving the home, running away to escape demands), pica (eating of inedible objects such as nail polish, cleaning erasers, deodorant, paper), rumination, and noncompliance. These severe problem behaviors occur daily. While [D.D.'s] problem behavior used to be more manageable, during the past 8 months, caregivers and providers report that he now requires intensive management to prevent injury to others and himself.

(AR 241.)

KKI's Authorization Request includes summations of correspondence received from providers. (AR 242.) Thomas D. Challman, M.D., Medical Director of Geisinger Autism & Developmental Medicine Institute, wrote in support of [D.D.'s] admission to KKI on December 15, 2018. After summarizing D.D's behavioral issues and treatment, Dr. Challman concluded that

it is medically necessary for [D.D.] to be admitted to an inpatient unit for stabilization. His behaviors pose significant and imminent risk to himself and others. A prolonged stay, over 4-6 months or longer, will likely be necessary as he will require behavioral training and medication trials, which will take time. It is imperative that medication trials take place in a setting that is safe for [D.D.] and his caregivers.

> . . . [KKI's NBU] is the best option for [D.D.'s] treatment, as we have exhausted our local and regional resources.

(AR 251; *see also* AR 242.)

Jose Bordas, M.D., a physician in the pediatric practice which had treated D.D. since 2008, also wrote in support of D.D.'s admission to KKI's NBU. (AR 255; *see also* AR 242.) In his December 17, 2018, correspondence, Dr. Bordas stated that

> [o]ver the past months, [D.D.'s] behavior has escalated putting his caregivers and himself at risk for physical harm. His behaviors are unpredictable and given his build and level of increasing strength and aggressiveness, he poses a serious risk to those in his immediate environment.

> It is medically necessary for [D.D.] to be admitted to an inpatient unit for stabilization during a prolonged stay of 6 months or longer. This is necessary to provide [D.D.] with behavioral therapy services, medication trials that will take time to show results. It is imperative that when adjusting medications and trying new forms of therapy that this be conducted in an environment that is safe for both himself and his caregivers.

(*Id.*)

Ashley Daniels, MS, LBS, who had been overseeing D.D.'s behavioral treatment by ABA Support Services, LLC, since the Spring of 2017 indicated in December 2018 that there had been an increase in D.D.'s intensity of aggression, self-injury, property destruction and overall tantrums over the preceding few months. (D000252; *see also* D000242.) After reviewing problematic behavior and care challenges, ABA's Clinical Director Nicholas Eckman (writing on behalf of Ms. Daniels) stated that

> [o]verall [D.D.] continues to require a high level of support and a high ratio of adults to maintain safety. Without an increased level of support and increased intensity of treatment it is likely that [D.D.] will continue to show high and

6

dangerous rates of problem behavior. Without additional support, it is likely that [D.D.] will be at risk for a permanent out of home placement. [D.D.] would benefit from an increased level of support where he can be more comprehensively evaluated and receive a more comprehensive treatment package to assist with skill building deficit areas.

(*Id.*)

At the time of the evaluation, D.D. was attending an extended school year program at Colonial Academy IU20 in the Autism Support classroom which is a program specifically designed to manage students with high levels of problem behavior. (AR 241-42.) The program was staffed 3:1 and staff members were wearing arm guards and chest plates to protect themselves from D.D.'s aggression. (AR 242.)

The April 30, 2019, KKI correspondence noted under "Previous Interventions" that

[s]everal behavioral plans have been implemented in the school to address [D.D.'s] severe behavior problems. [D.D.'s] academic tasks were modified, they followed a structured routine, he was redirected to other activities the teacher and aides block head banging and apply compression, and a "code [D]" is in effect to call for back up staff to assist in physical restraint during aggressive and self-injurious behavior outbursts. However, his behavior problems were noted to have increased in frequency and severity despites these interventions. Physical restraint is increasing in the school as [D.D.] continues to engage in new behaviors. Specifically, in the bathroom he will disrobe, fecal smear, and refuse to get dressed and attempt to leave the bathroom naked. It takes several staff to physically restrain him and dress him before leaving he bathroom. This has become a pattern of behavior and occurs near daily. [D.D.] continues to urinate and have bowel movements on the floor as a result.

[D.D.] was hospitalized in the emergency department at St. Luke's Hospital as a result of his worsening episodes of head banging, aggression and self-injury at school.

(AR 243.)

KKI assessed D.D.'s risks, stating that his

> severe problem behaviors place him and others at severe risk of injury on a daily basis. Caregivers and teachers routinely sustain injuries, such as bruises, cuts, scratches, hits, and kicks. [D.D's] 1:1 aide at school has a permanently damaged forearm muscle as a result of his bites. [D.D.] has sustained nose bleeds, bruises, scratches, lacerations, a chipped tooth, black and swollen eyes, bite marks, broken skin, and cracked toenails from his self-injury and head banging. [D.D.] is at risk to himself of concussion, retinal detachment or severe injury from head banging, as well as elopement from caregivers into streets and attempt to get out of moving vehicles.

(AR 244.)

KKI described the risk of lack of hospitalization as follows:

> *Without immediate and intensive inpatient treatment at a specialized facility, [D.D.'s] maladaptive behaviors will only become more severe and treatment resistant, and will further prohibit him from being able to function at home or in the community.* His current behavioral and medical providers have noted that [D.D.'s] behavior has not responded adequately to available outpatient psychiatric and behavioral treatment, and has worsened in the past 8 months. Each provider has noted that [D.D.'s] behavior is too complex and dangerous to treat on an outpatient basis and that he requires a specialized, long-term inpatient hospitalization to effectively treat his maladaptive behaviors, particularly aggression and self-injury. Based upon [D.D'.s] serious, persistent and escalating behavioral problems, coupled with his lack of response to past and current treatments, the NBU team has determined that [D.D.] presents considerable and ongoing risk to himself and others for serious bodily injury.

> We are therefore requesting authorization for admission to the Kennedy Krieger Institute's Neurobehavioral Unit. Given [D.D.'s] complicated behavioral profile and the treatment-resistant nature of his problem behaviors, a four-month admission to the program will be needed to adequately assess these behaviors, develop an effective treatment, generalize the treatment across settings, and train care providers.

> [D.D.] has received behavioral and psychiatric services to address his severe behavior problems; however, these less intensive treatments have failed and his behavior problems have worsened.

(AR 244-45.)

In response to KKI's authorization request for a four-month course of treatment,

Anthem granted coverage of treatment for five days, and later, granted a two-day extension.

(PSMF ¶ 35.) D.D. was admitted to the NBU on May 1, 2019. (PSMF ¶ 36.) May 2, 2019,

correspondence from Anthem indicates that D.D. was approved for five days of inpatient

care at KKI, i.e., from May 1, 2019, to May 5, 2019. (AR 829.)

The KKI admission records provide as follows:

> [D.D.] is a fifteen-year-old boy he was admitted to the NBU for assessment and
> treatment of severe aggression (punching, pinching, hair pulling, head butting,
> hitting, kicking, biting others, choking, binding others fingers backwards), self-
> injury (head banging, self biting, punching, forceful dropping to knees,
> slamming knuckles of feet, bends back fingers), disruptive and destructive
> behaviors (biting objects, breaking objects, throwing items, climbing shelves,
> kicking walls, moving around in the car), elopement (running from caregivers,
> leaving the home, running away to escape demands), pica (eating of inedible
> objects such as nail polish, cleaning erasers, deodorant, paper) rumination and
> noncompliance.

(AR 424; *see also* PSMF ¶ 37.)

The admission goals were identified as follows: "to develop a treatment that reduces

[D.D.'s] problem behaviors by at least 80 percent from preliminary treatment, generalize the

treatment to other settings and care providers, and to train the parents and care providers to

accurately implement the treatment program." (*See, e.g.*, AR 710; *see also* PSMF ¶ 37.)

May 7, 2019, correspondence from Anthem indicates that two additional days of care

were approved, i.e, D.D. was authorized to receive inpatient care at KKI for May 6, 2019, and May 7, 2019. (AR 853.)

Anthem denied coverage for KKI treatment beyond May 7, 2019. (PSMF ¶ 36.) In its May 10, 2019, correspondence to D.D., Anthem explained why the request was not approved:

> You went to the hospital due to a risk of harming yourself. Your doctor has asked to extend your stay. The plan clinical criteria considers hospital care medically necessary for those who are an imminent danger to themselves. The information we have shows you have improved and you are stable enough to be safely treated outside of a hospital. You are not at risk of harming yourself. For this reason, the request for you to remain in the hospital is denied as not medically necessary. There may be other treatment options to help you, such as outpatient services. . . . It may help you to know that we reviewed this request using MCG Guideline Inpatient Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-IP).

(AR 228.)

Following the denial, a level one expedited appeal was submitted and Anthem upheld the denial. (PSMF ¶ 39.) Anthem's health plan Medical Director, Charlisa Allen, M.D., reviewed the appeal, Anthem records indicating that the reason for the referral was "Reached maximum benefit."[2] (AR 757.) Dr. Allen's note lists rates of problem behaviors

---

[2] The Court notes that Anthem's internal records found in the Administrative Record at pages 753 through 790 contain information material to Anthem's determination and, therefore, material to this Court's assessment of whether its decision to deny extended coverage satisfies the requisite standard, *see infra* pp. 35-38. The Court will not draw any negative inference that the extremely small font of the documents submitted represents an attempt to hinder the Court's analysis or obfuscate the issues. Nonetheless, the submission of documents which may be charitably described as barely legible is entirely inappropriate in Court filings, particularly when the records include medical reviewer notes as they do here (*see, e.g.,* AR 757-58, 770-71, 778).

from May 1, 2019, to May 7, 2019: 12.5 SIB (self-injurious behaviors) per day;[3] 57.14 other

SIB per day; 35.86 aggressive behaviors; 3.43 disruptive behaviors per day; 8 biting of

others per day; .71 head banging per day; 15.25 elopement per day. (*Id.*) She also identifies

the treatment plan in place which includes the notation that "Depakote was decreased on

5/3/19 following labs that indicated his platelet count was too low. Plan will be to make sure

and add. Dec. to Depakote in upcoming weeks to regain stability in platelet count." (*Id.*)

On May 14, 2019, a peer-to-peer call was conducted between Dr. Allen and D.D.'s

KKI doctors, behavioral analyst, Jonathan Schmidt, Ph.D., and psychiatrist, Elaine Tierney,

M.D. (*Id.*) Anthem's records describe the substance of the call as follows:

> "[the KKI providers] summarized the behaviors member had been exhibiting.
> He had been decompensating for at least 8 months, and had not done well with
> outpatient treatment with ABA [Applied Behavior Analysis]. Member had been
> receiving in home ABA services for long period of time. He was not having
> acute decompensation, and they were unable to define a stable baseline for
> member. The doctors and ABA therapist are treating long term issues, with no
> firm baseline to compare this, and member appears to be in for long term
> hospital stay ELOS 4 months."

(PSMF ¶ 39 (quoting AR 757).)[4]

---

[3] The Court assumes this is the number of head related self-injurious behavior as other SIB is listed separately and KKI separates "other" SIB and "head" SIB in the medical records. (*See, e.g.,* AR 290.)

[4] Plaintiff provides the following definition of "decompensation": "Decompensation is a clinical term used to describe a mentally ill individual's state of mental health when he or she was previously managing the illness well but suffered a downturn at a certain stage. That stage is considered a decompensation or decline in overall condition." Doc. 33-2 at 8, n.2 (citing https://www.disabilitybenefitscenter.org/glossary/episodes-decompensation#:~:text=Decompensation%20is%20a%20clinical%20term,periods%20of%20decline%20th at%20occur (last accessed 3/22/21).)

After listing documents reviewed ("ACMP WMDS AND OR MEDICAL RECORDS" (AR 757)) and providing the summary of the peer-to-peer conversation set out above, Dr. Allen noted "Discussed with AP that we are making coverage decisions, not treatment decisions, and he/she is are responsible for treating your patient as he/she deems necessary." (*Id.*) Dr. Allen then provided the following assessment:

BASED ON THE INFORMATION AVAILABLE . . .

LEVEL OF CARE MEDICALLY NECESSARY FOR THE TREATMENT OF MEMBERS CONDITION WOULD BE:

Long term care in group home, therapeutic boarding school with OP follow up and ABA services.

. . . .

PCR RATIONALE – The doctors and ABA therapist are treating long term issues, with no firm baseline to compare this, and member appears to be in for a long term hospital stay – ELOS 4 months. Member has chronic self harm issues – see note, and could be managed in a long term placement, with ABA services.

AP informed of decision and appeals process
I have the appropriate scope of the licensure and/or certification typically managing the medical condition, procedure, treatment or issues under review; and current relevant experience and/or knowledge to render a determination.

Comments
We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. Your doctor wanted you to have continued hospital care. You were in the hospital because you were at a high risk for harm. We understand that you would like us to change our first decision. Now we have new information from another telephone call with your doctors. We still do not think this is medically necessary for you. We believe our first decision is correct for the following reason. After the treatment you got in the hospital, you were no longer at high risk for harm.

> You could have been treated with outpatient services. We based the decision
> on the MCG guideline Inpatient Behavioral Health Level of Care, Child or
> Adolescent (ORG: B-902-IP).

(AR 757-58.)

Plaintiff was advised of this decision by letter of May 14, 2019. (AR 912-13.) Anthem

provided the following explanation for its denial of inpatient services from May 8, 2019,

through May 14, 2019:

> Your plan has reviewed your specific circumstances and health condition as
> documented in the appeal and medical records provided to us by your treating
> physicians. The reviewer, Charlisa Allen MD, is a health plan Medical Director
> who is board certified and specializes in Psychiatry. It's her recommendation
> that we keep our previous coverage decision. Here's why:
>
> We reviewed all the information that was given to us before with the first
> request for coverage. We also reviewed all that was given to us for the appeal.
> Your doctor wanted you to have continued hospital care. You were in the
> hospital because you were at a high risk for harm. We understand that you
> would like us to change our first decision. Now we have new information from
> another telephone call with your doctors. We still do not think this is medically
> necessary for you. We believe our first decision is correct for the following
> reason. After the treatment you got in the hospital, you were no longer at a high
> risk for harm. You could have been treated with outpatient services. We based
> the decision on the MCG guideline Inpatient Behavioral Health Level of Care,
> Child or Adolescent (ORG: B-902-IP).

(AR 912-13.) Anthem's letter also references the Summary Plan Description's definition of

Medical Necessity but does not elaborate on its finding on this issue. (AR 913.)

In KKI correspondence dated May 31, 2019, and received by Anthem on June 6,

2019, KKI submitted a second level appeal of Anthem's denial. (AR 222, 1012.) KKI wrote

> in support of the position that, contrary to Anthem's assertion, the medical
> necessity of [D.D.'s] treatment at KKI did not end on May 8, 2019 and continued

coverage is both medically necessary and imperative to his long-term success. (D00221-279). In support of the appeal, KKI submitted a letter written by Elaine Tierney, M.D., a Pediatric and Adult Psychiatrist at the NBU, and Jonathan Schmidt, Ph.D., a Senior Behavior Analyst at the NBU, addressing the continued medical necessity for treatment along with the April 30, 2019 authorization request and letters from D.D's providers addressing the necessity for his admission to the KKI program and KKI's medical records. (D00221-395). Dr. Tierney and Dr. Schmidt state that "Anthem's denial is unfathomable" as D.D. "continues to present a significant risk of harm to both himself and others around him." (D00223).

(PSMF ¶ 46.)

KKI's second level appeal letter authored by Dr. Tierney and Dr. Schmidt included extensive specific information. From the date of denial, May 9, 2019, to May 24, 2019, D.D. engaged in an average of 59 instances of self-injurious behavior, 39 instances of physical aggression, and 6 instances of destructive behaviors per day, totaling 104 behaviors per day. (AR 224; *see also* PSMF ¶ 47.) On May 22, 2019, a staff member received a laceration to the hand by D.D. while attempting to manage a behavioral outburst. (*Id.*) The letter further stated that

> the behavior team at KKI has recently completed a functional behavior assessment (FBA), which included functional analyses (FAs), indirect assessments with parents and school staff, and direct observations. Results have concluded that [D.D.] will engage in these behaviors to access attention from others and preferred activities. Currently, we are in the process of developing an individualized and comprehensive treatment plan for [D.D.] to target significant and sustained reduction in his severe and dangerous behaviors.
>
> The behavior team has continued to work extensively on the development of this behavior plan and is currently evaluating interventions to target behaviors maintained by attention and denied access. These interventions include: a structured schedule[], reinforcement systems,

functional communication training, and competing stimuli. Once these evaluations are complete, training to all staff and caregivers will be initiated to ensure that treatment gains and effects are generalized to those individuals who will be responsible for [D.D.'s] continued care post-discharge. This will ensure the continuity of care and appropriate responding over an extended period of time and decrease likelihood that [D.D.] will regress or display similar rates of as was reported [sic] prior to at the time of his admission.

In conjunction with behavioral treatment, specific psychopharmacological changes have since been made to [D.D.'s] medications. Upon admission, through results obtained via bloodwork, it was determined that [D.D.'s] platelet count was extremely low, most likely due to valproic acid levels. This posed a potential serious medical risk for [D.D.]. Thus, his valproic acid was decreased from 1300mg to 1000mg on 5/4/19 and later 700mg on 5/11/19. Following the most recent bloodwork, [D.D.'s] platelet count is now within normal range. However, it is important to note, that while valproic acid was being titrated down, [D.D.'s] mood was reported to have shifted such that he often displayed more negative affect (i.e., crying and screaming), along with bouts of agitation and reactivity.

Specifically, as mentioned above concerning his behavioral outbursts, [D.D.] would become severely agitated, begin screaming/crying, and engage in dangerous bouts of physical aggression contingent upon minor changes to environment (i.e., denied access to attention or items of interest). [D.D.'s] reaction to these changes were not congruent with what would be expected, indicating extreme reactivity and impulsivity in his behavioral pattern of responding. This suggests that the valproic acid was most likely providing some positive support for mood stability and behavioral stabilization. To augment the effects of the current dose of valproic acid and target the underlying symptoms of reactivity and agitation, aripiprazole was increased on 5/15/19. This will take approximately 2 weeks to reach a steady state, at which time effects on behavioral targets may be better evaluated. Future medication plans will be to continue increasing aripiprazole to obtain maximum effects.

It is medically necessary that [D.D.] remain at KKI to conclude his treatment course so that his behavioral responding remains low and stable. This will ensure that his return home after discharge will not result in re-hospitalization. That is, if [D.D.] were to be discharged from our facility before he is medically and behaviorally stable (i.e., not engaging in high rates of self-injury, aggression, and destruction as evidenced above), there is an extremely

high likelihood that he will regress back to his behavioral presentation prior to his admission, and thus require an extensive need for services and unnecessary hospitalizations. . . .

Based on our experience with many similar cases, we are confident that we will make progress to the extent that [D.D.] will achieve behavioral stability and be able to fully and safely participate in family activities, academic programming, and community outings. In addition to research supporting this approach to treatment, our outcome data over the past 10 years indicates that we can reduce these behaviors by at least 80% for 80% of patients we treat on the NBU . . . .

These outcome data clearly demonstrate significant reductions when a full admission is supported to its logical conclusion. Thus, acceptable discharge criteria have not been met. [D.D.] and others remain at risk for injury, and the treatment is not completed to the point it can be successfully implemented in his home and community settings. Based on [D.D.'s] history and our experience with similar children, successful transition to his home and community will require: 1) continued treatment in-hospital, 2) additional intensive training to ensure caregivers deliver the treatment consistently and with good integrity, and 3) generalization of the treatment to ensure lasting effects of the treatment in the natural environment. Most of these activities are well underway. We assert that the interventions and services delivered since the date of denial (5/8/19) until present could only have been done in the inpatient setting. Having provided both inpatient and outpatient levels of service for over 25 ears, we are intimately familiar with the capabilities and limitations of each – and if we thought an outpatient level of service would be appropriate, we would have moved him to that level of service by now.

(AR 224-26.)

KKI also contrasted the care D.D. received on the NBU with custodial care.

First, custodial care is habilitative, meaning that the individual is being maintained and cared for with no intention for improving functioning. In contrast, care being provided to [D.D.] on the NBU is rehabilitative, in that the goals are to improve functioning so he will be able to participate in educational programming, and home and community life. Progress has been made in these efforts, but much more remains to be accomplished. Second, in light of the basic goals of custodial care, facilities providing such care often have one direct

16

care staff person managing 4 to 6 residents, rudimentary nursing monitoring, and weekly or monthly monitoring by a physician. If interdisciplinary care is being provided, the team may meet monthly or even every six months. In contrast, on the NBU: a) [D.D.] is staffed 1:1 by direct staff who collect detailed behavioral data during all waking hours, b) he is seen throughout the day by a nurse to monitor his medical status, c) he participates in 3.5 hours of intensive behavior therapy sessions by a team of 3 therapists, d) he attends therapies, and [e)] [he] is seen by a psychiatrist every day. His behavioral and psychiatric interventions are being monitored and adjusted continuously by his team, through the objective interpretation of behavioral data. Members of the team meet daily, and full team meetings occur weekly. These intensive treatments are necessary because his goals are rehabilitative and his needs are great.

(AR 226-27.)

Drs. Tierney and Schmidt concluded that based on their knowledge of the case, they

had

no doubt that discharge on the date of 5/8/19 would have resulted [in] re-hospitalization as [D.D.'s] behaviors remain acute. The good news is that we have identified the function of his problem behaviors and are able to move forward with behavioral treatment. We feel strongly that we will see improvements with a highly individualized behavioral treatment and effective medication regimen in place. Further we are confident that additional improvement can be achieved and sustained after discharge.

(AR 227.) For the foregoing reasons, Drs. Tierney and Schmidt requested that services be

authorized from May 8, 2019, until discharge criteria have been met. (*Id.*)

With the letter of June 14, 2019, Anthem denied the second level appeal. (AR 927-

28.) Anthem repeated the rationale of its earlier denial almost verbatim, the only difference

being that the information relied on in the June 14th letter was "new information from the

hospital medical record plus letters" rather than "new information from another telephone

call with your doctors" relied on in the May 14th decision. (*See* AR 912-13, 927-28.) In the

June 14th letter, the health plan medical director is not identified by name but appears to be

Abe Soliman, M.D., based on Anthem's records which indicate that Abe Soliman, M.D.,

conducted an internal review related to the appeal and his "Internal MD Rationale" is

identical to the text of the second paragraph of Anthem's June 14, 2019. (*See* AR 770, 927-

28.) Dr. Soliman's June 14, 2019, record entry concerning his second level appeal chart

review includes the following assessments:

> PT remains on the same meds. He is medically stable, but has movement d/o.
> Pt show no changes. He remains impulsive and aggressive. No reported SI or
> HI. Decision: Patient has Autism and severe intellectual disability. He has long
> Hx of aggressive. Pt is medically stable and he has good support system. No
> reported SI or HI. Pt is compliant with meds. Therefore, the medical necessity
> criteria do not appear to be met for IP MH.  Alternative level of care is OP MH.

(AR 778.)

KKI submitted a request for independent external review on July 11, 2019, "in

response to the denial of benefits for the dates of service 5/8/19 to current." (AR 396.)

Enclosed with the July 11, 2019, correspondence was a letter from KKI Drs. Tierney and

Schmidt dated July 9, 2019, requesting an independent external review of Anthem's denial

of benefits for the dates of service "5/8/19 to the present day and beyond" as such coverage

was considered "both medically necessary and imperative to [D.D.'s] long-term success."

(AR 397.)  After providing background information and a review of Anthem's June 14, 2019,

letter, Drs. Tierney and Schmidt provided the following response to the denial:

> Anthem's Denial does not align with the plethora of information provided below
> and on all previous conference calls indicating that [D.D.] and others around
> [D.D.] remain at high risk of harm on a daily basis due to his severe behaviors,

as evidenced by the data and list of staff injuries since his admission. Upon [D.D.'s] admission to the NBU on 5/1/19/ up until the present date of 7/8/19, Daniel has continued to engage in severe and persistent self-injurious (hits and punches to his head, face, and body, along with self-biting, skin-pinching, and forcefully banging [h]is knees and feet to the floor), physically aggressive (hitting, punching, kicking, grabbing, biting, head-butting), destructive (throwing and breaking items and kicking walls and furniture), and elopement behaviors (running more than 3 feet away from a caregiver towards a marked exit) on a daily basis. **Since the date of denial to 6/17/19, with baseline contingencies in place (i.e., naturally occurring consequences including attention and escape for problem behavior), [D.D.] engaged in an average of 63 instances of self-injurious behavior, 29 instances of physical aggression, 6 instances of destructive behavior, and 10 instances of elopement, totaling 108 behaviors per day.**

Furthermore, data are also collected on behavioral outbursts, defined as 5 or more combined instances of self-injury, aggression, and destruction within a 2 minute period, often requiring an additional staff member to safely manage. Since the date of denial . . . on 5/8/19 to 6/17/19, [D.D.] engaged in an average of 2 outbursts, staff had to wear protective equipment including double padded arm guards and padded gloves to protect themselves from bites and scratches. Staff must also apply a padded helmet to prevent injuries to the face from physical aggression, such as scratching, hair-pulling, and head-butting. Even with these added precautions, staff have still incurred injuries that required medical attention. . . .

Since [D.D.'s] admission, the behavior team at KKI completed a functional behavioral assessment (FBA) . . . . Following the conclusion of the FBA, extensive treatment evaluations were concluded to develop a comprehensive and individualized behavioral treatment package that may target a reduction in [D.D.'s] severe behaviors . . . . While . . . targeted [treatment] components were effective in reducing overall rates of self-injury, aggression, destruction, and elopement when [D.D.] was in the presence of his behavioral treatment team, extensive training of staff was initiated to extend and generalize treatment effects across the course of the entire day – to mimic a home and school schedule. Thus, the aforementioned behavioral treatment was introduced 24hrs/day, Monday-Friday beginning 6/18/19.

Since the introduction of the behavioral treatment package across the day, [D.D.'s] severe behaviors have remained variable, specifically correlated

with medication changes, targeting continued mood dysregulation, significant sleep disturbances, and bouts of agitation and impulsivity/reactivity (please refer to the medical section below to further detail pharmacological interventions). **Since 6/18/19 to the current date of 7/8/19, with treatment contingencies in place, [D.D.] is engaging in an average of 66 instances of self-injurious behavior, 31 instances of physical aggression, 6 instances of destructive behavior, and 17 instances of elopement, totaling 120 behaviors per day**. Within that timeframe, additional staff injury reports have occurred . . . .

**Specifically, within the most current week (7/2/19-7/8/19), [D.D.] has engaged in an average of 39 instances of self-injurious behavior, 13 instances of physical aggression, 7 instances of destructive behavior, and 10 instances of elopement, totaling 69 behaviors per day**. While his overall average frequency of severe behaviors is slightly lower compared to the previous week, overall rates and the intensity of the behaviors remain significant. Thus, the behavior team has been working on updating and modifying his treatment package to address the most current behavioral issues, along with collaborating closely with psychiatry to target [D.D.'s] underlying psychiatric presentation. . . . Additionally, extensive training with staff and caregivers will be initiated to ensure that treatment gains and effects are generalized to those individuals who will be responsible for [D.D.'s] continued care post-discharge. This will ensure the continuity of care and appropriate responding over an extended period of time and decrease the likelihood that [D.D.] will regress or display similar rates of as was reported [sic] prior to at the time of his admission.

MEDICAL.
In conjunction with behavioral treatment, specific psychopharmacological changes have been made to [D.D.'s] medications throughout the course of his admission. Upon admission, through results obtained via bloodwork, it was determined that [D.D.'s] platelent count was extremely low, most likely due to valproic acid levels. This posed a serious medical risk for [D.D.]. Thus, his valproic acid was decreased . . . on 5/4/19 and . . . [again] on 5/11/19. Following more recent bloodwork, [D.D.'s] platelet count is now within the normal range. However, it is important to note that while valproic acid was being titrated down, [D.D.'s] mood was reported to have shifted such that he often displayed more negative affect (i.e., crying and screaming), along with bouts of agitation and reactivity.

These bouts of agitation and reactivity would often occur within the context of large and prolonged behavioral outbursts, characterized by screaming/crying and severe physical aggression contingent upon minor changes in his environment . . . . Daniel's reactions to these changes were not congruent with what would be expected, indicating extreme reactivity and impulsivity in his behavioral pattern of responding. To target the underlying symptoms of reactivity and agitation, aripiprazole was increased on 5/15/19 . . . . While minor effects to his overall behavioral presentation were observed, D.D.'s sleep pattern continued to be irregular, such that he would fall asleep around 10 p.m. and wake up consistently between 3:30 a.m. and 4:30 a.m.

During these early wake-up times, he would become overly active and disruptive, exhibiting loud vocalizations and dangerous behaviors (e.g., jumping out of bed, engaging in fecal smearing, and banging surfaces in his room). In an effort to further maximize the behavioral effects of aripiprazole and potentially stabilize his sleep, this medication was increased again in 5/30/19 and . . . [increased again] on 6/21/29. Daniel's sleep disturbances and irregular sleeping patterns persisted despite these changes. On 6/24/19, his valproic acid was increased in the evening . . . ; however, his platelet count with a CBC was taken and closely monitored. During the period that valproic acid was increased . . . (from 6/24/19 to 6/27/29), [D.D.'s] agitation increased significantly, which further led to instability and elevations in his dangerous behaviors, as evidenced by multiple staff injuries during this time. Valporic acid was later decreased . . . on 6/28/19. Most recently, in a continued effort to regulate his sleep and extreme behavioral responding, olanzapine was added to his medication regimen on 7/8/19. This addition will be closely monitored by the psychiatrist over the next week to maximize the potential effects of this newest medication trial.

In summation, it is medically necessary that [D.D.] remain at KKI to conclude his treatment course so that his behavioral responding stabilizes and may remain low over the course of several days. This will ensure that his return home after discharge will not result in re-hospitalization. That is, if [D.D.] were to be discharged from our facility before he is medically and behaviorally stable (i.e., not engaging in high rates of self-injury, aggression, and destruction as evidenced above), there is an extremely high likelihood that he will regress back to his behavioral presentation prior to his admission, injuring himself or someone else, and thus require extensive need for services and unnecessary hospitalizations. There is a well-documented history that all outpatient and in-home services [D.D] was receiving prior to the current admission resulted in no

sustained or significant changes to his behavior; thus, there is no reason to believe that this will change if he is discharged now without a finalized behavioral and psychopharmacological treatment plan in place.

Based on our experience with many similar cases, we are confident that we will make progress to the extent that [D.D.] will achieve behavioral and psychiatric stability and be able to fully and safely participate in family activities, academic programming, and community outings.

(AR 398-402.)

After pointing to research and data supportive of KKI's approach to treatment, Drs.

Tierney and Schmidt stated that acceptable discharge criteria had not been met and the

activities geared toward satisfying the criteria were well underway but could only be done in

an inpatient setting—if they thought an outpatient level of service would be appropriate, they

would have moved [D.D.] to that level of service. (AR 403.) The letter again outlined the

care D.D. was receiving on the NBU and summarized their opinion:

on the NBU: a) [D.D.] is staffed 1:1 by direct staff who collect detailed behavioral data during all waking hours, b) he is seen throughout the day by a nurse to monitor his medical status, c) he participates in 3.5 hours of intensive behavior therapy sessions by a team of 3 therapists, d) he attends therapies, and [e)] [he] is seen by a psychiatrist every day. His behavioral and psychiatric interventions are being monitored and adjusted continuously by his team, through the objective interpretation of behavioral data. Members of the team meet daily, and full team meetings occur weekly. These intensive treatments are necessary because his goals are rehabilitative and his needs are great.

In short, based on our knowledge of this case, we have no doubt that discharge on the date of 5/8/19 would have resulted [in] re-hospitalization as [D.D.'s] behaviors remain acute. The good news is that we have identified the function of his problem behaviors and are able to move forward with behavioral treatment. We feel strongly that we will see improvements with a highly individualized behavioral treatment and effective medication regimen in place.

22

Further we are confident that additional improvement can be achieved and sustained after discharge.

(AR 403-04.[5])

Advanced Medical Review issued a letter on September 3, 2019, upholding

Anthem's denial. (AR 933.) The letter states:

Advanced Medical Review (AMR) is the Independent Review Organization (IRO) selected to review this case.

A physician reviewer, board certified in Psychiatry, Psychiatry Child & Adolescent, Sleep Medicine, and Psychiatry with Expertise in Eating Disorders has reviewed the case regarding the aforementioned plan member.

After careful consideration of all relevant medical information, attending health care professional's recommendation, appropriate practice guidelines, applicable criteria sets, standards and interpretation guidelines, and terms of the Plan, AMR upholds the carrier's decision and the request is denied.

Please refer to the attached document for a brief case summary and reviewer comments referenced in the performance of this review.

(*Id.*)

The Peer Reviewer Final Report attached to the letter was completed on September

3, 2019. (AR 937.) It lists the medical records reviewed, including Anthem letters of May 10,

2019, May 14, 2019, and June 14, 2019, KKI letter of May 31, 2019,[6] KKI medical records

dated May 1, 2019, to July 7, 2019, MCG Health Inpatient Behavioral Health Level of Care

Child or Adolescent (B-902-IP (BHG)) dated June 24, 2019, and the relevant benefits plan.

---

[5] Drs. Tierney and Schmidt had previously outlined D.D.'s treatment and their prognosis in their May 31, 2019, Second Level of Appeal letter. (*See* AR 227-27.)

[6] KKI's letters of July 9, 2019, and July 11, 2019, (AR 396-404) are not listed in the documents reviewed. (AR 937.)

(*Id.*) The Report provides a general review and answers specific questions related to the requested services. (AR 937-38.)

> The patient is a 16-year-old male, who was admitted to the acute inpatient psychiatric unit on 05/01/2019. He was diagnosed with autism spectrum disorder, obsessive-compulsive disorder, conduct disorder, and severe intellectual disability. The patient was reported to have been admitted for worsening symptoms of agitation, aggression, mood dysphoria, and persistent self-injurious behaviors. He was also reported to have been engaging in property destruction and elopement from home. The patient was reported to have behaviors related to pica.

> The patient was reported to have a significant history of psychiatric treatment including psychiatric hospitalizations in the past. He was reported to have been receiving applied behavioral analysis (ABA) therapy and 30-40 hours a week of in-home support. The patient was not reported to have significant ongoing medical conditions that require hospital intervention. He was noted to have a medical history significant for seizure disorder. He was not reported to have any significant history of substance use.

> The patient was provided with individual, group, milieu, and family therapy in addition to medication management while on the acute inpatient psychiatric unit. He was noted to have had functional behavioral assessments performed while admitted to the inpatient unit. He was prescribed psychotropic medications including aripiprazole and sodium valproate. Medications were optimized for adequate symptom control. The patient was not reported to have any significant adverse effects from his psychotropic medications.

> The patient was not noted to have any significant acute behavioral symptoms that represented a change from baseline as of 05/08/2019. He was not reported to have any suicidal or homicidal ideations with plans or stated intent. He was not reported to have any symptoms suggestive of psychosis including command hallucinations, persecutory delusions, or extreme paranoia. The patient was noted to have intermittent episodes of self-injurious behaviors and intermittent aggression, which appeared to be his baseline related to pervasive developmental disorder and intellectual disability. He was not reported to have any symptoms of mania or hypomania. The patient had no significant ongoing medical problems that required hospital interventions. There was no indication that the patient had any significant change in daily

functioning from baseline. The patient was not reported to have any significant deterioration from baseline or emergence of new symptoms during his continued stay on the inpatient unit.

**REQUESTS/QUESTIONS:**
**Requested Services**: Psychiatric acute inpatient level of care

1. Has sufficient information been provided to render and opinion? **Yes**

     Sufficient information has been provided to render an opinion regarding the medical necessity of continued acute inpatient psychiatric hospitalization from 05/08/2019 forward. . . .

2. Is the proposed treatment medically necessary (can provision of the treatment, in whole or in part, reasonably be expected to be health beneficial for the patient and/or can withholding treatment, in whole or in part, reasonably be expected to affect the patient's health adversely)? **No**

     Based on current peer-reviewed, evidence based medical literature, the requested service (acute inpatient stay from 05/08/2019 forward) was not found to be medically necessary. The clinical information provided does not indicate that the service requested is medically necessary or likely to be successful in treating the patient's symptoms. Acute inpatient psychiatric level of care would be considered medically necessary when there is imminent risk of harm to self or others as indicated by persistent suicidal or homicidal ideations with plans or stated intent or when the patient has significant agitation and aggression, which is of acute onset and represents a clear change from baseline (1-6). Inpatient level of care may also be required in individuals with significant ongoing symptoms of psychosis or mania and in those with significant acute onset of functional impairments related to behavioral symptoms (7-8). The patient was not noted to have any significant acute behavioral symptoms that represented a change from baseline as of 05/08/2019. He was not reported to have any suicidal or homicidal ideations with plans as stated intent. The patient was noted to have intermittent episodes of self-injurious behaviors and intermittent aggression, which appeared to be his baseline related to pervasive developmental disorder and intellectual disability. The patient was not reported to have any symptoms suggestive of psychosis including command hallucinations, persecutory delusioins, or extreme paranoia. There was not indication that the patient had any symptoms suggestive of acute mania or hypomania. The patient was reported to have significant ongoing medical

25

conditions that required hospital-based interventions or monitoring.[7]  There was no indication that the patient had any significant change in daily functioning from baseline. The patient was not reported to have any significant deterioration from baseline or emergence of new symptoms during his continued stay on the inpatient unit. The patient may have been managed at a lower level of care such as at a residential treatment unit for developmentally disabled children. There was no indication that the patient required acute inpatient care.

3. Is there an absence of available alternate therapies? **No.**

Clinical information reviewed does not indicate that there was an absence of alternative level of treatment for this patient. The patient was not reported to have any acute behavioral symptoms that represented a change from the baseline as of 05/08/09. The patient was noted to have intermittent episodes of self-injurious behaviors and intermittent aggression towards staff and family, which appeared to be his baseline behaviors related to pervasive developmental disorder and intellectual disability. The patient may have been treated at the residential treatment level of care for his ongoing symptoms. There was no indication that residential treatment was not available for this patient.

4. Is the proposed treatment medically necessary according to the patient's health insurance certificate? **No**

The proposed treatment (continued acute inpatient psychiatric hospitalization from 05/08/2019 forward) was not found to be medically necessary according to the patient's health insurance certificate. The patient's health insurance certificate limits coverage to medically appropriate services, which are deemed medically necessary based on current standards of medical practice. Continued hospitalization from 05/08/2019 was not found to be medically necessary in this patient based on current medical literature and accepted standards of medical practice. Therefore, the proposed treatment was not found to be medically necessary according to the patient's health insurance certificate.

---

[7] Based on previous iterations of this finding where the reviewer indicated that D.D. did **not** have significant ongoing medical problems that required hospital interventions, the Court assumes that the word "not" was mistakenly omitted from this sentence, i.e., it is meant to read that "[t]he patient was *not* reported to have significant ongoing medical conditions that required hospital-based interventions or monitoring."

5. Should the health plan cover the proposed treatment? **No**

      The health plan should not cover the proposed treatment (continued inpatient psychiatric hospitalization from 05/08/2019 forward). The patient was not noted to have any significant acute behavioral symptoms that are possibly a change from baseline that required continued inpatient hospitalization as of 05/08/2019. There was no indication that the patient had any significant change in daily functioning from his baseline. The patient may have been managed at a lower level of care such as in a residential treatment unit. There was no indication that the patient continued to require acute inpatient psychiatric hospitalization. Therefore, the health plan should not cover the proposed treatment.

(AR 937-39.)

      The record shows the following averages regarding problematic behaviors per day, i.e., self-injurious behavior, physical aggression, destructive behavior, and elopement while D.D. was a patient on the NBU:

1. Analysis of Extended Periods

   - May 1, 2019 - May 12, 2019: 124.56 (AR 323 (KKI May 13, 2019, Progress Note))

   - May 1, 2019 – May 30, 2019: 123.74 (AR 574 (KKI May 31, 2019, Progress Note))

   - May 1, 2019 – June 6, 2019: 117.74 (AR 712 (KKI June 28, 2019, Progress Note))

   - May 8, 2019 – June 17, 2019: 108 (AR 399 (KKI July 9, 2019, letter))

   - June 18, 2019 – July 8, 2019: 120 (AR 400 (KKI July 9, 2019, letter))

2.  Analysis of Periods of Shorter Duration

- May 1, 2019 – May 5, 2019: 150 (AR 289-90 (May 6, 2019, Progress Note)

- May 6, 2019 – May 12, 2019: 105 (AR 323 (KKI May 13, 2019, Progress Note))

- May 24, 2019 – May 30, 2019: 132.15 (AR 574 (KKI May 31, 2019, Progress Note))

- May 31, 2019 – June 7, 2019: 82 (AR 614 (KKI June 7, 2019, Progress Note))

- June 18, 2019 – June 27, 2019: 157.89 (AR 712 (KKI June 28, 2019 Progress Note))

- June 28, 2019 – July 4, 2019: 68.2 (AR 740 (KKI July 5, 2019, Progress Note))

The record also shows instances where D.D. was assessed by KKI not to be in distress, to have a neutral affect, and have decreased problem behaviors. (*See, e.g.,* DSMF ¶¶ 75, 77-79, 81, 84, 87, 90, 92, 100, 101,104.)  Similarly, the record sometimes indicated appropriate sleep duration (See, e.g., DSMG ¶¶ 86, 93, 103.)

D.D. stayed at KKI until October 24, 2019. (DSMG ¶ 108.) Neither Plaintiff nor KKI submitted medical records to Anthem for dates of service after July 7, 2019. (*Id.*)

The MCG Guideline Inpatient Behavioral Health Level of Care, Child or Adolescent (ORG:B-902-IP) is the Guideline which Anthem indicated to be the basis for its review of requests for continuing care and the denial of appeals and which AMR indicated to be a record considered. (*See* AR 228, 235, 928, 937.) The Guideline contains several

components, including Admission Guidelines, Recovery Course, and Discharge Guidelines.

(AR 1021-22.) "Admission Guidelines" are as follows:

- Admission to Inpatient Level of Care for Child or Adolescent is indicated due to **ALL** of the following:

  o Patient risk of severity of behavioral health disorder is appropriate to proposed level of care as indicated by **1 or more** of the following . . . :

    ▪ Imminent danger to self for child or adolescent

    ▪ Imminent danger to others for child or adolescent

    ▪ Behavioral health disorder is present and appropriate for inpatient care with **ALL** of the following:
      - **Severe** Psychiatric, behavioral, or other comorbid conditions for child or adolescent
      - Severe dysfunction in daily living for child or adolescent

  + Treatment services at proposed level of care are indicated
  + Situation and expectations are appropriate for inpatient care for Child or adolescent

(AR 1021.)

The "Recovery Course" section of the guidelines identifies "Continuing Care" as

Stage 1 and identifies the "Clinical Status" component to be "Continued treatment needed

for condition as described in Admission Guidelines Treatment plan with goals and progress

measurements in place." (AR 1021.)

Detailed "Discharge Guidelines" provide as follows:

- Continued inpatient care generally is needed until **1 or more** of the following . . . :

29

o Continued inpatient care is no longer necessary due to adequate patient stabilization or improvement as indicated by ALL of the following . . . :

- Risk status acceptable as indicated by **ALL** of the following:
  - Danger to self or others manageable as indicated by **1 or more** of the following:
    - o Absence of Thoughts of suicide, homicide, or serious Harm to self or to another
    - o Thoughts of suicide, homicide, or serious Harm to self or to another present but manageable at available, lower level of care
  - Patients and supports understand follow-up treatment and crisis plan.
  - Provider and supports are sufficiently available at lower level of care.
  - Patient, as appropriate, can participate as needed in monitoring at available lower level of care.

- Functional status acceptable as indicated by **1 or more** of the following:
  - No essential function is significantly impaired.
  - An essential function is impaired, but impairment is manageable at available lower level of care.

- Medical needs absent or manageable at available lower level of care as indicated by **ALL** of the following:
  - Adverse medication effects absent or manageable
  - Medical comorbidity absent or manageable
  - Medical complications absent or manageable (eg, complication of eating disorder
  - Substance related disorder absent or manageable

- Treatment goals for level of care met

o Inpatient care is no longer appropriate due to patient progress record or consent as indicated by 1 or more of the following:

- Lack of improvement indicates need for long-term custodial facility.
- Guardian no longer consents to treatment and involuntary treatment is not deemed necessary.

(AR 1022.)

The following explanatory footnotes are relevant. Regarding indications for admission to an inpatient psychiatric unit, the MCG Guideline states that "[s]ymptoms or conditions used to determine the appropriate treatment intensity should be due to the underlying behavioral diagnosis or represent factors that contribute to destabilization of the underlying diagnosis, and are acute in nature or represent a significant worsening over baseline." (AR 1024 n.B.) The severity of the behavioral and other comorbid conditions

> [m]ay be based on symptom severity alone (including intensity and frequency of symptoms and the extent to which they interfere with functioning), or may be due to other factors (EG, comorbid medical illness, developmental condition, cognitive impairment, substance use disorder or other factors that contribute to destabilization or decreased ability to cope with the underlying behavioral health disorder). If the comorbidity affects the level of care appropriate to meet the patient's behavioral health needs, the manner in which it impacts the behavioral health condition (and now the comorbidity will be managed at the appropriate level of care) should be documented in order to optimize patient care.

(*Id.* n.C.) "Essential functions" are defined as "those that are necessary to sustain life, such as feeding and hydrating oneself." (*Id.* n.H.) The Administrative Record also includes a definition of "harm" associated with B-902-IP: "Harm to self or another is considered serious if it has a substantial likelihood of causing death, disability, or major disfigurement." (AR 1050.)

31

### III. STANDARD OF REVIEW

Summary judgment is appropriate "only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a

32

genuine dispute, or that an adverse party cannot product admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied,* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable juror could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255.  Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may

be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary. Courts may consider video evidence in determining whether disputes of material fact exist. *See Scott*, 550 U.S. at 379–81.

A district court "should consider cross-motions for summary judgment separately and apply the burden of production to each motion."[8] *Beenick v. LeFebvre*, 684 F. App'x 200, 205 (3d Cir. 2017) (not precedential) (citing *Lawrence*, 527 F.3d at 310). "If upon review of cross motions for summary judgment [the court] find[s] no genuine dispute over material facts, then [the court] will order judgment to be entered in favor of the party deserving judgment in light of the law and undisputed facts." *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998) (citing *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145–46 (3d Cir. 1998)).

---

[8] *Beenick* further explains,

[the plaintiff] argues that the District Court failed to apply the correct standard on cross-motions for summary judgment because it did not fully consider his motion for partial summary judgment. Beenick is correct that a District Court should consider cross-motions for summary judgment separately and apply the appropriate burden of production to each motion. *See Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). The District Court did not violate this rule because it did not consider the cross-motions simultaneously. Rather, it addressed Defendants' motion for summary judgment first. By proceeding with Defendants' motion first, the District Court viewed the evidence in the light most favorable to Beenick and concluded that Defendants were entitled to summary judgment on all of his claims. That conclusion ended the case and mooted any need to consider Beenick's cross-motion for partial summary judgment.

*Beenick v. LeFebvre*, 684 F. App'x 200, 205–06 (3d Cir. 2017).

## IV. ANALYSIS

### A. Plaintiff's Motion for Summary Judgment

Plaintiff asserts that summary judgment in his favor is warranted because Anthem's denial of the request for D.D.'s "continued treatment at KKI constitutes an abuse of discretion as the determination is unreasonable and unsupported by substantial evidence because it ignores the opinions of D.D.'s treating physicians and common sense, which establish that the medical necessity of D.D.'s treatment at KKI did not end on May 8, 2019." (Doc. 38 at 18.) Defendant responds that Plaintiff's Motion for Summary Judgment should be denied and Anthem's Cross-Motion for Summary Judgment should be granted "because substantial evidence in the record supports the decision that D.D.'s continued treatment at KKI was not medically necessary after May 7, 2019. (Doc. 50 at 1.) The Court concludes that Plaintiff's Motion is properly granted in part.

"Under the ERISA record rule, judicial review of an ERISA fiduciary's discretionary adverse benefit decision is confined to the information contained in the administrative record." *Noga v. Fulton Fin. Corp. Emp. Benefit Plan*, 19 F.4th 264, 271–72 (3d Cir. 2021) (citing *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 (3d Cir. 2010) (explaining that, "under most circumstances," the administrative record "cannot be supplemented during litigation"). The administrative record "typically contains relevant plan documents (such as an insurance policy), the claim file (the claim, supporting information supplied by the claimant, as well as information related to the claim that was considered, collected, or generated by the

fiduciary), and the fiduciary's final determination with respect to the claim." *Noga*, 19 F.4th at 272 (citing *Howley*, 625 F.3d at 793). The Third Circuit Court of Appeals has explained that "this rule is not without exceptions. A court may certainly 'consider evidence of potential biases and conflicts of interest that is not found in the administrator's record.'" *Howley*, 625 F.3d at 793 (quoting *Kosiba v. Merck & Co.*, 384 F.3d 58, 67 n.5 (3d Cir. 2004)); *see also Burke v. Pitney Bowes Inc. Long–Term Disability Plan,* 544 F.3d 1016, 1028 (9th Cir.2008) ("[T]he district court may consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest.") (internal quotation marks omitted).

The Supreme Court has held that a district court's standard of review "depends on whether a plan grants discretion to the fiduciary who makes benefits decisions." *Noga*, 19 F.4th at 272 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). If a plan does not grant discretion to the fiduciary, "then a court reviews an adverse benefit determination *de novo. See id.* But if a plan does confer discretionary authority on a fiduciary decision-maker, then a court reviews an adverse benefit determination for an abuse of discretion under the arbitrary-and-capricious standard."[9] *Id.* (citing *Firestone*, 489 U.S. at 115; *McCann v. Unum Provident*, 907 F.3d 130, 147 (3d Cir. 2018)). The deference

---

[9] This Circuit has held that the ERISA record rule does not apply to adverse benefit determinations subject to *de novo* review. *See Luby*, 944 F.2d at 1185 (holding that "*de novo* review over an ERISA determination between beneficiary claimants is not limited to the evidence before the [plan administrator]"). *Noga*, 19 F.4th at 273.

to an adverse determination made under the arbitrary and capricious standard arises out of ERISA's roots in trust law and imposition of fiduciary responsibility on administrators. *Firestone*, 489 U.S. at 110. As stated in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), in determining benefit eligibility, "the administrator owes a special duty of loyalty to the plan beneficiaries." *Id.* at 111.

In this case, parties agree that the arbitrary-and-capricious standard applies. (Doc. 38 at 25; Doc. 50 at 1.) The Court of Appeals for the Third Circuit has explained that

> [t]his standard is nominally deferential: a fiduciary's decision "will not be disturbed if reasonable." *Conkright v. Frommert*, 559 U.S. 506, 521, 130 S.Ct. 1640, 176 L.Ed.2d 469 (2010) (quoting *Firestone* [*Tire & Rubber Co. v. Burch*], 489 U.S. [101, 111], 109  S.Ct. 948, 103 L.Ed.2d 80 (1989)).

> Nonetheless, there are several ways in which a fiduciary who makes benefits decisions may fail the arbitrary-and-capricious standard. An adverse benefit determination made "without reason, unsupported by substantial evidence or erroneous as a matter of law" qualifies as arbitrary and capricious. *Abnathya* [*v. Hoffman-LaRoche, Inc.*], 2 F.3d [40, 45 (3d Cir. 1993)] (quoting *Adamo v. Anchor Hocking Corp.*, 720 F. Supp. 491, 500 (W.D. Pa. 1989)); *see also Grossmuller v. Int'l Union, United Auto. Workers, Loc. 813*, 715 F.2d 853, 858 n.5 (3d Cir. 1983) (requiring a plan administrator to "consider the position of both sides before rendering a decision" (emphasis and citation omitted)). In addition, a combination of case-specific structural and procedural factors may demonstrate that a fiduciary abused its discretion in making an adverse benefit determination, and such a decision would likewise fail arbitrary-and-capricious review. *See* [*Metropolitan Life Ins. Co. v.*] *Glenn*, 554 U.S. [105, 116–17, 128 S.Ct. 2343 (2008)]; *Est. of Schwing v. Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009); *see also Miller* [*v. Am. Airlines, Inc.*], 632 F.3d [837, 845 n.2 (3d Cir. 2011)] ("In the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical." (citation omitted)).

> The structural consideration under the combination-of-factors analysis focuses on the role of financial incentives in the plan's administration. *See Post* [*v. Hartford Ins. Co.*], 501 F.3d [154, 162 (3d Cir. 2007) (overruled on other

grounds by *Estate of Schwing v. Lily Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009)]. When the same entity administers a plan and pays the benefits due under the plan, it has a structural conflict of interest. *See Glenn*, 554 U.S. at 114], 128 S.Ct. 2343; *see also Miller*, 632 F.3d at 847 ("[A] conflict arises where an employer both funds and evaluates claims." (citation omitted)). But that conflict alone does not render a fiduciary's adverse benefit determination an abuse of discretion. *See Glenn*, 554 U.S. at 117–18, 128 S.Ct. 2343; *Dowling v. Pension Plan for Salaried Emps. of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 250–51 (3d Cir. 2017); *Fleisher*, 679 F.3d at 122 n.3 (stating that a conflict of interest "is not ... inherently a determinative factor" (citation omitted)). Rather, "that conflict must be weighed as [one] factor," *Firestone*, 489 U.S. at 115, 109 S.Ct. 948 (internal quotation marks and alteration omitted), along with "the process ... used in denying benefits," *Miller*, 632 F.3d at 845. *See Glenn*, 554 U.S. at 111, 118–19, 128 S. Ct. 2343.

The procedural factor examines the presence or absence of irregularities in the handling of benefit claims. Not every anomaly carries great weight; a fiduciary, even one with a structural conflict of interest, need not maintain a procedurally immaculate claim file to avoid an abuse-of-discretion finding. But critically, under the combination-of-factors analysis, procedural irregularities gain significance the more closely that they align with the financial incentives that create a structural conflict of interest. *See Glenn*, 554 U.S. at 117, 128 S.Ct. 2343. In that vein, caselaw has identified several procedural irregularities that bear directly on the financial incentives at the core of a structural conflict. *See Miller*, 632 F.3d at 848–55; *Post*, 501 F.3d at 166–68; *Kosiba*, 384 F.3d at 67–68; *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 393–94 (3d Cir. 2000), *abrogated on other grounds by Miller*, 632 F.3d at 847; *see also Glenn*, 554 U.S. at 118, 128 S. Ct. 2343.

*Noga*, 19 F.4th at 275–76.

Plaintiff alleges that "[s]ince defendant both evaluates and pays benefits claims, it operates under a conflict of interest as defined in *Glenn*." (Doc. 38 at 17.) Defendant responds that this case does not present a conflict of interest because Anthem is not financially responsible for paying benefits under the Plan and, instead, acts solely as Claims Administrator. (Doc. 50 at 27-28.) Plaintiff does not dispute this assertion in his reply brief.

(*See* Doc. 53.) Therefore, further discussion of whether there is a structural conflict of interest is not warranted and the Court will proceed with an analysis of whether procedural factors indicate an abuse of discretion in this case.

As stated in *Miller*, "'the procedural inquiry focuses on how the administrator treated the particular claimant.'" 632 F.3d at 845 (quoting *Post*, 501 F.3d at 162). *Miller* added that,

> in considering the process that the administrator used in denying benefits, we have considered numerous "irregularities" to determine "whether, in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality." [*Post*, 501 F.3d] at 165 (internal citations omitted). Ultimately, we "determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." *Glenn*, 554 U.S. at 117, 128 S. Ct. 2343.

*Miller*, 632 F.3d at 845.

A summary of procedural anomalies recognized by the Court of Appeals for the Third Circuit and Third Circuit district courts to "call into question the fairness of the process and suggest arbitrariness" was set out in *Harper v. Aetna Life Ins. Co.*, Civ. A. No. 10-1459, 2011 WL 1196860, at *2–3 (E.D. Pa. Mar. 31, 2011). The identified anomalies include:

> reversing a decision to award benefits without new medical evidence to support the change in position, [*Miller*, 632 F.3d] at 848; relying on the opinions of non-treating over treating physicians without reason, *Kosiba v. Merck & Co.,* 384 F.3d 58, 67–68 (3d Cir. 2004); *Ricca v. Prudential Ins. Co. of Am.,* 747 F. Supp. 2d 438, (E.D. Pa. 2010); failing to follow a plan's notification provisions, *Lemaire v. Hartford Life &Acc. Ins. Co.,* 69 F. App'x 88, 92–93 (3d Cir. 2003); failing to comply with the notice requirements of § 503 of ERISA by not giving specific reasons for the denial, *Miller,* 632 F.3d at 852; conducting self-serving paper reviews of medical files, *Post,* 501 F.3d at 166; failing to address all relevant diagnoses before terminating benefits, *Miller,* 632 F.3d at 853; relying on favorable parts while discarding unfavorable parts in a medical report, *Post,* 501 F.3d at 165; denying benefits based on inadequate information and lax

investigatory procedures, *Porter v. Broadspire,* 492 F. Supp. 2d 480, 485 (W.D. Pa. 2007); ignoring the recommendations of an insurance company's own employees, *Post,* 501 F.3d at 165; imposing requirements extrinsic to the plan, *Miller,* 632 F.3d at 849; and, failing to consider the claimant's specific job requirements under an "own occupation" policy, *id.* at 855.

A procedural anomaly may also arise if an insurer provides its outside consultant, who is offered as independent, with information that "alert[s] him to what [the insurer] had decided and why" so that he knows where the insurer was heading. *Morgan v. Prudential Ins. Co. of America,* [755 F. Supp. 2d 639, 647 (E.D. Pa. 2010)].

The claims process is viewed in its entirety. Each factor is evaluated in the context of the case. Any one factor may, but not always, compel a finding of arbitrariness. More than one irregularity suggests a biased process. Thus, we must weigh all factors together. *Glenn,* 55 U.S. at 117.

*Harper,* 2011 WL 1196860, at *2–3.

The question of what rationale should be evaluated for purposes of determining whether Defendant's decision to deny benefits was arbitrary and capricious is a threshold matter for the court to decide. In *Skretvedt v. E.I. DuPont de Nemours and Co.,* 268 F.3d 167 (3d Cir. 2001), the Circuit Court assumed *arguendo* that it was proper to consider justifications for the decision offered by the defendant at the litigation stage but never offered to the plaintiff following the denial of the claim, i.e., "post hoc" justifications, and found the proffered justifications unconvincing. *Id.* at 177-78, *abrogation on other grounds recognized by Goletz v. Prudential Ins. Co. of Ameica,* 383 F. App'x 193, 198 n.6 (3d Cir. 2010)). The Circuit Court provided the following explanation in the margin:

The [Review] Board's failure to provide Skretvedt with reasoned explanations for why it denied his disability claims or information on what evidence he could present to improve his claims raises policy concerns that underlie the notice

requirements that ERISA places on pension and benefit review boards. Specifically, the review boards must give reasons to applicants for denying their claims so that: (1) applicants may clarify their application on appeal; and (2) federal courts may exercise an informed and meaningful review of the pension boards' decisions.

. . . .

We find the lack of explanations in the denial letters that DuPont sent Skretvedt troubling. We do not reach the question whether the notice was legally inadequate under § 503, however, because we resolve this appeal on the ground that, even fully crediting the post hoc rationales offered by DuPont, the Board's decision to deny benefits was arbitrary and capricious. For the same reason, we decline to reach the question of what level of deference is owed to rationales for denying benefits under an ERISA-governed plan that a pension board presents for the first time in federal court. We take this opportunity, however, to underscore the importance of pension boards providing specific reasons for denying applicants' benefits claims, both so that applicants may introduce the proper evidence on appeal and so that a federal court may exercise meaningful review.

We note in this regard our agreement with the policy concerns identified in *University Hospitals of Cleveland v. Emerson Electric Co.*, 202 F.3d 839 (6th Cir.2000), where the court held that it would not defer to post hoc rationales for denying benefits claims generated for the purpose of litigation by ERISA plan administrators when those rationales did not appear in the denial letters sent to the benefits claimants or in the administrative record. The court observed that:

> it strikes us as problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review.... To depart from the administrative record in this fashion would, in our view, invite more terse and conclusory decisions from plan administrators, leaving room for

41

them—or, worse yet, federal judges—to brainstorm and invent various proposed "rational bases" when their decisions are challenged in ensuing litigation.

*Id.* at 848 n.7.

*Skretvedt*, 268 F.3d at 178 n.8.

Several circuit courts have held that post hoc rationalizations provided by the defendant in the litigation process are not appropriately considered when determining whether the decision of the plan administrator to deny coverage was arbitrary and capricious. As stated by the Tenth Circuit,

> federal courts will consider only "those rationales that were specifically articulated in the administrative record as the basis for denying a claim." *Flinders* [v. *Workforce Stabilization Plan of Philllips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007) (overruled on other grounds, *Holcomb v. Unum Life Ins. Co. of America*, 578 F.3d 1187, 1192-93 (10th Cir. 2009))]. "The reason for this rule is apparent[:] we will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation." *Id.* at 1191 (quotation marks and brackets omitted). A plan administrator may not "treat the administrative process as a trial run and offer a post hoc rationale in district court." *Id.* at 1192.

*Spradley v. Owens-Illinois Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135, 1140–41 (10th Cir. 2012); *see also David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293 (10th Cir. 2023) (same). In *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685 (7th Cir. 1992), the Circuit Court concluded that what might be a reasonable interpretation of a plan provision would not be considered on appeal because there was no evidence that the interpretation of the plan was espoused by the administrator when the plaintiff's benefits were terminated. *Id.* at 696. In

making this determination, the Seventh Circuit relied in part on *Short v. Central States, S.E. & S.W. Areas Pension Fund,* 729 F.2d 567 (8th Cir.1984), where the Eighth Circuit stated that "[a] *post hoc* attempt to furnish a rationale for a denial of ... benefits in order to avoid reversal on appeal, and thus meaningful review" is not acceptable." *Id.* at 575. In *Glista v. Unum Life Ins. Co. of America,* 378 F.3d 113, 116 (1st Cir. 2004), the First Circuit declined to consider the merits of the reason not articulated to the plaintiff where additional reason was articulated in litigation.

Relying on *Skretvedt,* courts within the Third Circuit have declined to consider post hoc rationalizations provided by a defendant in support of the denial of benefits. Although decided on a *de novo* standard, *Nair v. Pfizer, Inc.,* Civ. A. No. 07-5203, 2009 WL 1635380 (D.N.J. June 10, 2009), cited several cases decided on the arbitrary and capricious standard which declined to consider post hoc rationales for a denial of benefits, including *Schreibeis v. Ret. Plan for Employees of Duquesne Light Co.,* No. Civ.A. 04–969, 2005 WL 3447919, at *7–9 (W.D. Pa. Dec.15, 2005) (holding, in reliance on *Skredvedt,* that it was improper to consider post hoc rationales for plan's determination that plaintiff employee not eligible for benefits); *Doyle v. Nationwide Ins. Co.,* 240 F.Supp.2d 328, 347 (E.D. Pa.2003) (declining to consider administrator's post hoc rationales, in light of guidance provided by Third Circuit in *Skretvedt* ); *Carney v. Int'l Bhd. of Elec. Workers,* No. Civ. A.00–6270, 2002 WL 1060652, at *5–6 (E.D. Pa. May 23, 2002) (holding, based on *Skredvedt,* that benefits decisions may not be supported by post hoc rationales never communicated to applicant for

43

benefits). *Nair,* 2009 WL 1635380, at *10; *see also Connor v. Sedgewick Claims Management Services, Inc.,* 796 F. Supp. 2d 568, 576-77 (D.N.J. 2011); *Saket v. Avaya, Inc. Long Term Disability Plan for Salaried Employees*, Civ. A. No. 05-5910, 2007 WL 1827185, at *11-12 (D.N.J. June 25, 2007).

Based on the guidance provided in *Skretvedt* and the consideration of the issue by other circuit courts and district courts within the Third Circuit, the Court will not consider post hoc rationalizations except, in limited instances, the Court may do so on an "assuming *arguendo*" basis. Thus, in analyzing the previously identified procedural anomalies relevant to whether the Plan Administrator's decision to deny benefits was arbitrary and capricious, the Court focuses on those reasons provided to Plaintiff by Anthem and the independent reviewer.

In conducting this review, "a plan administrator's final, post-appeal decision should be the focus of review." *Funk v. CIGNA Grp. Ins.,* 648 F.3d 182, 191 n.11 (3d Cir. 2011), *abrogated on other grounds by Montanile v. Bd. of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136 (2016) (citing 29 C.F.R. § 2560.503-1(h). *Funk* added that "[t]o focus elsewhere would be inconsistent with ERISA's exhaustion requirement." *Id.* (citing *LaRue v. DeWolff, Boberg & Assocs., Inc.,* 552 U.S. 248, 258–259 (2008) (noting that claimants must "exhaust the administrative remedies mandated by ERISA § 503, 29 U.S.C. § 1133, before filing suit under § 502(a)(1)(B)"); *Metropolitan Life Ins. Co. v. Price,* 501 F.3d 271, 280 (3d Cir.2007) (similar). *Funk* further explained that

> [a] court may of course consider a plan administrator's pre-final decisions as evidence of the decision-making process that yielded the final decision, and it may be that questionable aspects of or inconsistencies among those pre-final decisions will prove significant in determining whether a plan administrator abused its discretion. *See, e.g., Miller,* 632 F.3d at 855–56 (considering unexplained inconsistencies between a plan administrator's initial and final disability determinations as a factor suggesting an abuse of discretion). In those instances, however, the pre-final decisions ought merely to inform a court's review of the final decision. *See generally id.*

*Funk,* 648 F.3d at 191 n.11.

In this case AMR's September 9, 2019, letter is the final post-appeal decision. Therefore, the letter and attached Peer Reviewer Final Report (AR 935, 937-40) will be the prime focus of the Court's review.

## A. Procedural Anomalies

The Court will assess procedural anomalies recognized in the Third Circuit, *see supra* pp.39-40, deemed relevant to Plaintiff's following allegations: D.D.'s condition was essentially unchanged from the time of admission to May 8, 2019, (Doc. 38 at 19, 29, 31; Doc. 53 at 5); Anthem gave inadequate consideration to D.D.'s treating doctors' opinions (Doc. 38 at 18-23); Anthem failed to consider all aspects of D.D.'s condition (Doc. 53 at 2); and AMR was not an independent reviewer (Doc. 38 at 28).

### 1. Reversal of Position/Inconsistent Treatment of Facts

Plaintiff's allegations that D.D.'s condition was essentially unchanged from the time of admission to May 8, 2019, (Doc. 38 at 19, 29, 31; Doc. 53 at 5) implicates the procedural anomalies related to reversal of an earlier decision and inconsistent treatment of facts.

45

As stated in *Miller*, "[a]n administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion." 632 F.3d at 848 (citing *Post*, 501 F.3d at 164–65; *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 393 (3d Cir.2000), *overruled on other grounds by* [*Metropolitan Life Ins. Co. v.*] *Glenn*, 554 U.S. 105 (2008). While "an initial payment of . . . benefits does not operate as an estoppel" such that the benefit decision cannot be changed, an absence of meaningful evidence to support the decision "is cause for concern that weighs in favor of finding that [the] decision was arbitrary and capricious." *Miller*, 632 F.3d at 849 (citations omitted). Similarly, *Pinto* noted that "inconsistent treatment of the same facts [is] viewed with suspicion." 214 F.3d at 393 (citing *Brown v. Blue Cross & Blue Shield of Ala.*, 898 F.2d 1556 (11th Cir. 1990), overruling on other grounds recognized by *Kaviani v. Reliance Standard Life Ins. Co.*, 799 F. App'x 753 (11th Cir. 2020)). *Brown* stated "[t]hat [the insurance company] would reach opposing conclusions on the basis of the same evidence seriously challenges the assumptions upon which deference is accorded to [its] interpretation of the plan." *Id.* at 1559. "Unexplained inconsistency that undermines the rationality of the plan administrator's decision" is what triggers the suggestion of arbitrary and capricious conduct. *See Martonik v. United of Omaha Life Ins. Co.*, Civ. A. No. 1:17-CV-00306, 2019 WL 3777842, at *10 (W.D. Pa. May 8, 2019). Courts have considered a shifting and inconsistent rationale in letters denying a beneficiary's extended stay at a residential treatment center to be a relevant factor in the

46

arbitrary and capricious inquiry. *See, e.g., D.K. v. United Behavioral Health*, Civ. A. No.

2:17-CV-1328-DAK, 2021 WL 2554109, at *12-13 (D. Ut. June 22, 2021).

In *Miller*, the plaintiff claimed that his benefits were abruptly terminated upon an

evaluation of essentially the same information that the plan administrator had previously

found to support an award of benefits. *Id.* at 848-49. The Circuit Court concluded that "in the

absence of any meaningful evidence to support a change in position, [the administrator's]

abrupt reversal is cause for concern that weighs in favor of finding that its termination

decision was arbitrary and capricious." *Id.* at 849. The Circuit Court ultimately gave

"significant weight" to its conclusion that the defendant "reversed its initial position that [the

plaintiff] was disabled and terminated his benefits without receiving supporting information

that differed in any material way from the information upon which it had previously relied."

*Id.* at 855-56.

Although this case is distinguishable from *Miller* because D.D. was approved for

inpatient care at KKI for a limited period and Defendant did not approve additional care,

analysis under *Miller* and similar decisions is warranted because, arguably, care was denied

without receiving medical information that was materially different from that previously

provided and facts that were materially the same were treated inconsistently. From May 1,

2019, to May 7, 2019, Anthem considered D.D. to be eligible for inpatient care at KKI based

on the information available preadmission. This means Anthem determined that KKI NBU

treatment was "medically necessary" upon admission through May 7th, a decision made

pursuant to the Milliman Care Guidelines ("MCG"), *see supra* p.4.

As set out previously, KKI's April 30, 2019, Authorization Request includes the

following information:

> [D.D. is] a 15-year-old male with a psychiatric disorder involving very serious behavioral dysfunction[.] [D.D.] is previously diagnosed with severe Intellectual Disability, Autism Spectrum Disorder, Disruptive Behavior Disorder not otherwise specified, Obsessive-Compulsive Disorder, seizures, and Macrocephaly Hypokinetic syndrome of childhood agitation. He is nonverbal with developmental delays. [D.D.] displays persistent and frequent self-injurious, aggressive, disruptive, destructive, and dangerous behaviors that have significantly worsened over the past year, particularly the past 8 months. The increase in frequency and intensity of maladaptive behaviors, particularly aggression and self-injury, places [D.D.] and others at risk of injury on a daily basis. The [NBU] team evaluated [D.D.] and concluded that inpatient admission to the NBU is medically necessary as previous outpatient behavioral services to treat his severe problem behaviors have not been successful and the danger he presents to himself and others has persisted and increased.
>
> Specifically, [D.D.] presents with severe aggression (punching, pinching, hair pulling, head butting, hitting, kicking, biting others, choking, bending others fingers backwards), self-injury (head banging, self biting, punching, forceful dropping to knees, slamming knuckles of feet, bends back fingers), disruptive and destructive behaviors (biting objects, breaking objections, throwing items, climbing shelves, kicking walls, moving around in the car), elopement (running from caregivers, leaving the home, running away to escape demands), pica (eating of inedible objects such as nail polish, cleaning erasers, deodorant, paper), rumination, and noncompliance. These severe problem behaviors occur daily. While [D.D.'s] problem behavior used to be more manageable, during the past 8 months, caregivers and providers report that he now requires intensive management to prevent injury to others and himself.

(AR 241.) KKI assessed D.D.'s risks, stating that his

severe problem behaviors place him and others at severe risk of injury on a daily basis. Caregivers and teachers routinely sustain injuries, such as bruises, cuts, scratches, hits, and kicks. [D.D's] 1:1 aide at school has a permanently damaged forearm muscle as a result of his bites. [D.D.] has sustained nose bleeds, bruises, scratches, lacerations, a chipped tooth, black and swollen eyes, bite marks, broken skin, and cracked toenails from his self-injury and head banging. [D.D.] is at risk to himself of concussion, retinal detachment or severe injury from head banging, as well as elopement from caregivers into streets and attempt to get out of moving vehicles.

(AR 244.)

Before reviewing Defendant's final decision, i.e., the AMR September 3, 2019, letter (AR 935) and Peer Reviewer Final Report (AR 937-39), the Court will review Anthem's earlier decisions. The Court does so because "questionable aspects of or inconsistencies among those pre-final decisions" may be significant in determining whether the Plan Administrator abused its discretion. *Funk*, 648 F.3d at 191 n.11 (citing 632 F.3d at 855–56).

Anthem's May 10, 2019, correspondence to D.D. explained why the request for treatment beyond May 7, 2019, was not approved:

> You went to the hospital due to a risk of harming yourself. Your doctor has asked to extend your stay. The plan clinical criteria considers hospital care medically necessary for those who are an imminent danger to themselves. The information we have shows you have improved and you are stable enough to be safely treated outside of a hospital. You are not at risk of harming yourself. For this reason, the request for you to remain in the hospital is denied as not medically necessary. There may be other treatment options to help you, such as outpatient services. . . . It may help you to know that we reviewed this request using MCG Guideline Inpatient Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-IP).

(AR 228.)

Following the denial, a level one expedited appeal was submitted and Anthem upheld the denial. (PSMF ¶ 39.) On May 14, 2019, a peer-to-peer call took place between Anthem's health plan Medical Director, Charlisa Allen, M.D., and D.D.'s KKI providers, behavioral analyst, Jonathan Schmidt, Ph.D., and psychiatrist, Elaine Tierney, M.D., after which Anthem decided that, because of the treatment he received in the hospital, D.D. was not at a high risk for harm and continued treatment at KKI was not necessary (AR 757-58). Notably, this rationale appears only in the conclusory "Comments" section of Dr. Allen's assessment—in the preceding substantive assessment, Dr. Allen does not opine that D.D. was no longer at a high risk for harm. (*See id*.) Rather, Dr. Allen notes that from May 1, 2019, to May 7, 2019, D.D. daily exhibited numerous harmful behaviors (to himself and others) (averaging 132.89 problem behaviors per day) and that KKI's treatment plan included, going forward, addressing D.D.'s low platelet count and related medication issues "in upcoming weeks." (See AR 757.)

Plaintiff was advised of Anthem's decision by letter of May 14, 2019. (AR 912-13.) Anthem provided the following explanation for its denial of inpatient services from May 8, 2019, through May 14, 2019:

> Your plan has reviewed your specific circumstances and health condition as documented in the appeal and medical records provided to us by your treating physicians. The reviewer, Charlisa Allen MD, is a health plan Medical Director who is board certified and specializes in Psychiatry. It's her recommendation that we keep our previous coverage decision. Here's why:
>
> We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. Your

doctor wanted you to have continued hospital care. You were in the hospital because you were at a high risk for harm. We understand that you would like us to change our first decision. Now we have new information from another telephone call with your doctors. We still do not think this is medically necessary for you. We believe our first decision is correct for the following reason. After the treatment you got in the hospital, you were no longer at a high risk for harm. You could have been treated with outpatient services. We based the decision on the MCG guideline Inpatient Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-IP).

(AR 912-13.) Anthem's letter also references the Summary Plan Description's definition of

Medical Necessity but does not elaborate on its finding on this issue. (AR 913.)

KKI's May 31, 2019, letter requesting a Voluntary Second Level Appeal included a

lengthy explanation for why "the medical necessity that [D.D.'s] treatment at KKI did not end

on 5/8/19 and continued coverage is both medically necessary and imperative to his long-

term success." (AR 222.) Anthem's June 14, 2019, letter denied the appeal, finding further

treatment not medically necessary for basically the same reasons as it had previously, i.e.,

D.D. was in the hospital because he was at high risk for harm and, despite new information,

Anthem believed the first decision was correct because, after the treatment received in the

hospital, D.D. was no longer at a high risk of harm and he could have been treated with

outpatient services. (AR 927-28.)

The reviewing health plan medical director is referenced but not identified by name in

the June 14, 2019. (AR 927.) The reviewer appears to be Abe Soliman, M.D., based on

Anthem's internal records which indicate that Abe Soliman, M.D., conducted a review

related to the May 31, 2019, appeal and his "Internal MD Rationale" is identical to the text of

the second paragraph of Anthem's June 14, 2019, letter. (*See* AR 770, 927-28.) Dr.

Soliman's undated comments indicate the following:

> Decision: Pt has autism and severe intellectual disability. He has long Hx of aggressive. Pt is medically stable and he has good support system. No reported SI or HI. Pt is compliant with meds. Therefore, the medical necessity criteria do not appear to be met of IP MH. Alternative level of care is OP MH.

(AR 771.) Notably, Dr. Soliman's June 14, 2019, record entry concerning his second level

appeal chart review includes his assessment that "Pt show no changes. He remains

impulsive and aggressive." (AR 778.) Thus, Dr. Soliman's closing notation that "after the

treatment you got in the hospital, you were no longer at a high risk for harm" (*id.*) is

contradicted by his finding that D.D. showed no changes. Moreover, Dr. Soliman's

statement that "Pt show no changes" contradicts his conclusion that further treatment was

not medically necessary: Anthem considered NBU treatment for D.D. medically necessary

from May 1, 2019, to May 7, 2019; if Dr. Soliman found that D.D. showed "no changes" as

of June 14, 2019, Anthem would have no basis to alter its initial medical necessity

determination.

In sum, Anthem's three denial letters indicate that the requests for continued care

were denied based on the assertions that D.D. went to the hospital because he was at a

high risk for harm, Anthem had information showing that D.D. had improved, D.D. was not

at risk or high risk for harming himself, and he could be safely treated outside of a hospital.

*See supra.* Anthem did not provide any details or citation to medical records; no basis for

the assessed improvement is proffered nor is there support for the risk assessment. In other

words, Anthem provides no support for its conclusion that D.D. was no longer at risk for harming himself. Most importantly, as set out above, the notes of both medical reviewers contradict the conclusions stated in their own notes and Anthem's letters.

Though no specific records were cited or discussed in Anthem's letters, if the Court were to consider Defendant's current argument that information provided in the medical records from May 1, 2019, to May 9, 2019, indicates that D.D. was not at risk for harming himself as of May 8th (as Anthem asserted conclusorily in its correspondence), the argument would fail because KKI records do not provide the suggested support. Anthem assessed D.D. to be at a high risk of harm upon admission and acknowledges that D.D. continued to engage in self-injurious behaviors as of May 9, 2019, (*see* Doc. 50 at 6-8). While there may have been periodic improvements in sleep and nutrition during the period approved by Anthem and instances where D.D.'s affect was neutral and he was not in distress (*see id.*), such changes/improvements do not indicate that the risk of harm assessed to be significant enough for admission was nonexistent or substantially diminished as of May 9, 2019. Similarly, although KKI's May 6, 2019, Daily Progress Note from the interdisciplinary team noted that D.D..'s "problem behaviors were variable but on a decreasing trend . . . [and] he [had] an average of 20 behaviors per hour and now he is 10 behaviors per hour" (AR 437), the assessment does not support Defendant's conclusion that D.D. was at a significantly reduced risk of harming himself as of May 9th. Defendant also seeks to undermine the fact that "D.D. continued to engage in self-injurious behaviors"

(Doc. 50 at 7) with internal Anthem file notations that "there were no reports of serious injury or any indication that they were not typical of his base line condition" (*id.* (citing AR 437, 444)). Defendant's baseline comment cannot be assessed as it is provided without context or explanation. Defendant does not explain how a lack of serious injury during a limited time period when a 1:1 staff ratio and numerous safeguards were in place indicates that D.D. was not at high risk of harming himself. Defendant does not attempt to correlate problem behaviors being "variable but on a decreasing trend" (AR 437) and fewer incidents of problem behaviors per hour with a lack of risk for harm as stated in the May 10, 2019, letter (AR 228 ("You are not at risk of harming yourself")) or a decreased risk of harm as implied in the May 14, 2019, letter and June 14, 2019, letter (AR 913, 927 ("you were no longer at a high risk for harm")). In light of the fact, recognized by Dr. Allen, that D.D. exhibited an average of 132.89 problem behaviors a day during the first seven days of his hospitalization (*see* AR 757), Defendant's current assessments regarding D.D.'s risk for harm are simply conclusory.[10]

In *Miller* terms, Defendant does not point to "any meaningful evidence to support a change in position," 632 F.3d at 849, i.e., to support its denial of the request for continued care. As in *Miller*, KKI records "do not differ in any material respect" from the information

---

[10] Defendant's current argument that D.D. did not pose a risk of "*serious* harm" to himself or others as the term is defined for purposes of B-902-IP (*see, e.g.*, Doc. 50 at 19), will be addressed later in the Memorandum Opinion. For present purposes, the Court notes that Anthem's denial letters did not use the term "serious harm" nor is the term used in the Admission Guidelines (*see* AR 1021).

submitted with KKI's Authorization Request that Anthem determined supported admission. *Id.* With no new material medical information to support its decreased risk assessment, Anthem's change of position from finding that D.D. warranted inpatient care from May 1, 2019, through May 7, 2019, to finding that he did not do so on May 8, 2019, shows "inconsistent treatment of the same facts" which the Court is to view with suspicion, *Pinto,* 214 F.3d at 393. It is also a situation where "opposing conclusions on the basis of the same evidence . . . seriously challenges" the deference due under the arbitrary and capricious standard. *Brown,* 898 F.2d at 1559.

Turning now to the final decision, the AMR letter merely confirmed Athem's previous decision (AR 935) and the analysis applied to the earlier letters equally applies here. Because the letter refers the reader to the attached Peer Reviewer Final Report for a case summary and reviewer comments, the Court will also review the report in which the reviewer expressed his opinions.

At the outset, the AMR reviewer summarized "Member Clinical Information," stating that D.D. "was reported to have been admitted for worsening symptoms of agitation, aggression, mood dysphoria, and persistent self-injurious behaviors. He was also reported to have been engaging in property destruction and elopement from home. The patient was reported to have behaviors related to pica." (AR 937.) The reviewer answered "No" to the question "Is the proposed treatment medically necessary (can provision of the treatment, in whole or in part, reasonably be expected to be health beneficial for the patient and/or can

withholding the treatment, in whole or in part, reasonably be expected to affect the patient's

health adversely)?". The reviewer notes many potential reasons for continued care that are

not relevant to the reason for D.D.'s admission or treatment course while at KKI, including

suicidal or homicidal ideations, symptoms suggestive of psychosis including command

hallucinations, persecutory delusions, extreme paranoia, or symptoms of mania or

hypomania. (*See* AR 938.) These warrant no discussion. What remains is the reviewer's

assessment that

> [t]he clinical information provided does not indicate that the service requested
> (inpatient stay from 05/08/2019 forward) is medically necessary or likely to be
> successful in treating the patient's symptoms. Acute inpatient psychiatric level
> of care would be considered medically necessary when there is imminent risk
> of harm to self or others . . . when the patient has significant agitation and
> aggression, which is of acute onset and represents a clear change from
> baseline. . . . The patient was not noted to have any significant acute behavioral
> symptoms that represented a change from baseline as of 05/08/2019. . . . The
> patient was noted to have intermittent episodes of self-injurious behaviors and
> intermittent aggression, which appeared to be his baseline related to pervasive
> developmental disorder and intellectual disability. . . . There was no indication
> that the patient had any significant change in daily functioning from baseline.
> The patient was not reported to have any significant deterioration from baseline
> or emergence of new symptoms during his continued stay on the inpatient unit.
> . . . There was no indication that the patient required acute inpatient psychiatric
> level of care.

(AR 938.)

For reasons similar to those discussed regarding Anthem's earlier denials, the

reviewer's statement that "[t]he clinical information provided does not indicate that the

service requested (inpatient stay from 05/08/2019 forward) is medically necessary"

suggests a reversal of position and evidences inconsistent treatment of the same or similar

facts. Nothing in the reviewer's assessment suggests the medical necessity decision was based on information that materially differed from that provided on admission and during the approval period upon which Anthem determined that NBU treatment was medically necessary. Because the reviewer does not suggest that D.D.'s condition had improved with treatment or that he was not at a high risk of harm, the AMR reviewer's assessment differs from that repeatedly asserted by Anthem-- that D.D. had improved and was no longer at a high risk of harm--and shows different treatment of the same facts. These findings support the suggestion that Anthem's denial was an abuse of discretion pursuant to Third Circuit caselaw. *See Miller* , 632 F.3d at 848; *Pinto*, 214 F.3d at 393.[11]

For the foregoing reasons, the Court concludes that Anthem's decision to deny coverage from May 8, 2019, forward exhibits an irregularity that suggests its decision was arbitrary and capricious.

---

[11] The Court cannot definitively determine the meaning of the AMR reviewer's observations concerning "baseline" because they are not provided with enough information for the Court to ascertain what is meant by "baseline" in the context presented. However, if "baseline" were interpreted to be D.D's condition and symptoms at admission, several statements support the conclusion that the reviewer found there was no significant change in D.D.'s problem behaviors from the time of admission going forward, including the following: D.D. "was not noted to have any significant acute behavioral symptoms that represented a change in baseline as of 05/08/2019"; "[t]he patient was noted to have intermittent episodes of self-injurious behaviors and intermittent aggression, which appeared to be his baseline related to pervasive developmental disorder and intellectual disability"; and "[t]he patient was not reported to have any significant deterioration from baseline or emergence of new symptoms during his continued stay on the inpatient unit." (AR 938).

## 2. Consideration of Opinion Evidence

Plaintiff's allegation that Anthem gave inadequate consideration to D.D.'s treating doctors' opinions (Doc. 38 at 18-23) implicates the procedural anomaly related to the consideration of opinion evidence.

Administrators of ERISA plans "are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831, (2003). In so holding, the Court explained that

> [p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions a treating physician. But we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Nord,* 538 U.S. at 834; *see also Stratton v. E.I. DuPont De Nemours & Co.,* 363 F.3d 250, 258 (3d Cir. 2004).

> An administrator may not selectively consider and credit medical opinions without articulating its thought processes for doing so. This is particularly applicable where, as here, the evidence it claims to rely on favors its employer and consists of non-treating and non-examining experts and there is substantial evidence to the contrary. *See, e.g., Schwarzwaelder v. Merrill Lynch & Co., Inc.,* 606 F.Supp.2d 546, 559 & n. 44 (W.D. Pa. 2009) (discussing a concern shared with other courts "where, as here, the administrator denies a claim with reliance on the reports of paper-review consultants, in opposition to the treating and examining physicians' consistent and concurring opinions that the claimant is disabled"); *Elms v. Prudential Ins. Co. of Am.,* No. 06–5127, 2008 WL 4444269, at *18–20 (E.D. Pa. Oct. 2, 2008) (rejecting as a self-serving, selective use of physicians' reports, Prudential's almost exclusive reliance on file reviews performed by non-examining physicians as weighed against evidence from doctors who had treated or examined and had

58

concluded the patient was impaired by significant disabilities).

*Ricca v. Prudential Ins. Co. of Am.,* 747 F. Supp. 2d 438, 445 (E.D. Pa. 2010).

Anthem relied solely on the paper reviews of its non-treating physicians, Dr. Allen and Dr. Soliman, without articulating its thought process for doing so. The record shows that the reviews provided by these doctors were cursory and internally contradictory, *see supra* pp. 10-17, 50, 52-53, whereas Dr. Tierney and Dr. Schmidt provided detailed analysis of D.D.'s problems, treatment, progress, and prognosis in support of their opinion that D.D.'s ongoing care on the NBU was medically necessary in both their Voluntary Second Level of Appeal letter dated May 31, 2019, (AR 222-26) and their request for Independent External Review letter dated July 9, 2019, (AR 397-404).[12]

Notably, as discussed above, in contrast to the rationales for denial stated in Anthem's letters, outside of their conclusory comments, neither Dr. Allen nor Dr. Soliman substantively assessed that D.D. had improved since his admission to KKI. *See supra pp.* 50-53. In fact, Dr. Soliman's review specifically stated "Pt show *no changes*. He remains impulsive and aggressive." (AR 778 (emphasis added).) Given these findings, the Court

---

[12] AMR's Peer Reviewer Final Report lists the May 31, 2019, letter under "Medical Records" but does not list the Independent External Review letter dated July 9, 2019. (*See* AR 937.) The eight-page appeal letter was enclosed with the cover letter sent to Anthem requesting an independent external review. (*See* AR 396.) The letter is not mentioned in Anthem's July 30, 2019, note listing "[m]aterials for external appeal." (*See* AR 790.) Because the July 9, 2019, letter from Drs. Tierney and Schmidt is part of the administrative record submitted by Defendant (*see* Doc. 30-17), it is properly considered in the Court's analysis. It is also likely that it was reviewed by the AMR reviewer because, in answer to the question of whether sufficient information was provided for the reviewer to render an opinion, the reviewer stated that clinical information provided included "*appeal letters* from treating providers." (AR 938 (emphasis added).)

cannot conclude that the opinions provided by Dr. Allen and Dr. Soliman constitute "reliable evidence" upon which Anthem could rely without the need for explanation. *See Nord*, 538 U.S. at 834.

The record shows no such specific explanation or implied consideration by Dr. Soliman or any other Anthem professional of the rationale for need for continuing care presented by Dr. Tierney and Dr. Schmidt. (*See* AR 770-71, 778.) The AMR letter stated that it had considered "attending health care professional's recommendation" (AR 935) and the reviewer acknowledged receipt of the letter from Dr. Tierney and Dr. Schmidt dated May 31, 2019, but did not address the opinions stated therein, i.e., the treating doctors' opinions. (*See* AR 937-939.) Similarly, no mention is made of the opinions of D.D.'s preadmission treating providers who opined on the medical necessity of D.D.'s admission to an inpatient unit. *See supra* p. 5-6.

Given that Anthem and AMR made only passing reference to the opinions of D.D.'s treating providers, the Court has no basis to conclude Anthem did not arbitrarily refuse to credit their opinions. Thus, the Court cannot say that Defendant complied with the requirements of *Nord,* in its consideration of treating doctors' opinions. *See* 538 U.S. at 834. Recognizing that the Court may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation," *id.*, for the reasons discussed above and additional reasons to follow, the Court cannot conclude that Defendant credited reliable evidence. Therefore, this is a case where

Anthem was required to articulate its thought process for crediting non-treating doctors' opinions over those of treating doctors, *Ricca*, 747 F. Supp. 2d at 445, and did not do so. For these reasons, the Court concludes that this factor suggests that Anthem's decision was arbitrary and capricious.

### 3. Analysis of All Relevant Diagnoses

Plaintiff's allegation that Anthem failed to consider all aspects of D.D.'s condition (Doc. 53 at 2) implicates the procedural anomaly related to the analysis of relevant conditions.

"An administrator's failure to address all relevant diagnoses in terminating a claimant's benefits is also a cause for concern that suggests the decision may have been arbitrary and capricious." *Miller*, 632 F.3d at 853 (citing *Kosiba,* 384 F.3d at 68–69). *Miller* noted that, in *Kosiba,* the circuit court "instructed the district court to consider on remand whether the administrator properly evaluated the claimant's medical conditions [and] emphasized that an administrator's failure to take into account multiple documented diagnoses suggests that a denial of benefits was not the product of reasoned decision-making." *Id.*

Here, the AMR reviewer noted D.D.'s multiple diagnoses. However, the reviewer did not evaluate the diagnoses. Because the Court has no basis to conclude that the reviewer took the multiple diagnoses into account in finding that continued care at KKI was not medically necessary, this factor also suggests an abuse of discretion.

### 4. Review Independence

Plaintiff's allegation that AMR was not an independent reviewer (Doc. 38 at 28) implicates the procedural anomaly related to the relationship between the defendant and the independent reviewer.

In *Morgan*, the court found that a medical reviewer's report lacked independence where the administrator not only provided the reviewer with the claimant's medical records, but also with the administrator's internal reports "that alerted him to what [the administrator] had decided and why." 755 F. Supp. 2d at 647. Here, it appears that Anthem provided internal reports that alerted the AMR reviewer to what Anthem had previously decided and why.

In AMR's Peer Review Final Report, "Medical Records" listed include "PREST Review Report for DD dated 5/9/19" and "Notes not dated." (AR 937.) While the Court cannot ascertain whether the latter are notes from Anthem, the former is presumably a note on the "Anthem Care Management Platform" found under the heading "Review Details" on a page which references "PREST" and indicates May 9, 2019, as the "Review Complete Date" (*see* AR 947). Under the "Reason for Referral" heading, "Medical Necessity" is stated. (*Id.*) The Review text states:

> Reason for referral to MD (Include specific criteria not met, questions/concerns for MD to address) – Mbr was admitted to KENNEDY KRIEGER INSTITUTE which is a specialty program for Autism. This is a long term acute unit which does not appear to be a covered benefit. Mbr does not present with any current acuity such as no SI [suicidal ideations], no HI [homicidal ideations], no AHV

[auditory verbal hallucinations]. Per UR, loc is acute however appears more residential.
Confirmed Available Alternat LOC (including provider name, # and available appt. dates) – Request is for long term care which does not appear to be a covered benefit.
DX (written-out) – F94.8 STEREOTYPED MOVEMENT DISORDERS, F91.9 Conduct Disorder, unspecified, F84.0 Autistic Disorder, OCD, F72 Severe intellectual disabilities, Disruptive Mood Dysregulation DO.

(AR 947.)

Finding this procedural anomaly suggestive of an arbitrary and capricious decision does not hinge on a correlation between the information provided by the plan administrator relative to its decision and the independent reviewer's medical necessity evaluation—it is the fact of the provision of such internal reports that matters. 755 F. Supp. 2d at 647. The report quoted above certainly alerted the AMR reviewer to what Anthem was thinking: D.D. was not covered for the requested care and he did not present with identified symptoms. (AR 947.) Thus, Anthem's provision of its internal review assessment to the AMR reviewer renders the AMR reviewer's independence suspect which presents a procedural anomaly suggestive of arbitrary and capricious decision-making. Further, while no correlation between Anthem's findings and the AMR reviewer's findings need be established, the Court notes that the AMR reviewer made similar assessments regarding acuity, suicidal ideations and homicidal ideations. (See AR 938, 948.)

## 5. Weighing the Factors

"To decide whether an administrator's termination of benefits is arbitrary and capricious, we 'determine lawfulness by taking account of several different, often case-

specific, factors, reaching a result by weighing all together.'" *Miller*, 632 F.3d at 855 (quoting *Glenn*, 554 U.S. at 117). The Court will now assess the weight due the factors discussed above.

*Miller* gave "significant weight" to the conclusions that the defendant had "reversed its initial position without receiving supporting information that differed in any material way from the information upon which it previously relied and did not fully evaluate all of the plaintiff's diagnoses [including his risk of experiencing a recurring psychotic episode]." *Id.* at 855-56. Though contextually distinguishable, Anthem's denial is similarly deficient. Thus, in deciding whether Anthem's decision was arbitrary and capricious, the Court gives moderate (rather than significant) weight to Anthem's decision to deny benefits based on facts that did not differ in any material way from those facts which it deemed suitable to initially approve admission. The weight assigned is supported by the conclusion that the records shows inconsistent treatment of the same or similar facts. *See, Pinto,* 214 F.3d at 393.

The Court gives some weight to Anthem's failure to address all of D.D.'s diagnoses. The Court gives significant weight to Anthem's reliance only on the paper reviews of non-treating physicians without articulating its thought process for doing so. In deciding what weight to give the AMR reviewer's potential lack of independence, the Court takes into account that the AMR is an IRO where, in *Morgan*, the defendant hired an individual doctor to conduct an independent review. *See* 755 F. Supp. 2d at 647. Based on this distinction

and the uncertainty of what documents were reviewed in this case, this factor is accorded little weight.

Viewing these factors as a whole, the numerous procedural anomalies suggest that Anthem's decision was arbitrary and capricious. The following discussion of whether substantial evidence supports Anthem's decision bolsters this suggestion.

## B. Substantial Evidence

In response to Plaintiff's argument that continued care for D.D. was medically necessary, Anthem asserts that substantial evidence in the Administrative Record establishes that continued treatment was not medically necessary. (Doc. 50 at 18.) Anthem references and relies on the MCG in making medical necessity determinations. (DSMF ¶ 73.) Anthem has identified the MCG B-902-IP, the guideline which addresses "Inpatient Behavioral Health Level of Care, Child or Adolescent," as that used to determine whether continued care at the KKI NBU was medically necessary. (DSMF ¶ 80.)

In opposition to Plaintiff's position and in support of its continuing care denial, Anthem specifically argues that substantial evidence supports its conclusion that the specific conditions described in the MCG discharge criteria were satisfied after May 7, 2019, and therefore, its benefits decision was not arbitrary and capricious. (Doc. 50 at 18-19.) In its reply brief, Anthem states that "[t]he administrative record . . . demonstrates that in making their Medical Necessity determination, Anthem and the IRO relied not just on the

MCG but also on the experience, expertise, and professional judgment of their medical reviewers." (Doc. 57 at 3.)

Because Anthem used the MCG B-902-IP and the judgment of its reviewers to determine medical necessity, the Court will assess whether substantial evidence supports Anthem's conclusion regarding specific discharge criteria by looking at the reviewers' analyses and the B-902-IP criteria at issue. For the reasons previously discussed, the reviews conducted by Anthem's doctors, Dr. Allen and Dr. Soliman, do not support Anthem's medical necessity determination. *See supra* pp. 49-53, 58. Therefore, when assessing reviewer support for Anthem's decision, the Court focuses on AMR's "Peer Reviewer Final Report" (AR 937-940).

In asserting that D.D. met all relevant B-902-IP discharge criteria, Defendant asserts that 1) D.D. did not pose a serious risk of harm to himself or others warranting continued treatment at KKI, 2) D.D. did not have an impairment of an essential function, 3) D.D. did not have adverse medication effects that required continued treatment at KKI, 4) providers and support were available at a lower level of care, and 5) treatment goals for the level of care were met. (Doc. 50 at 19-25.)  Plaintiff responds by questioning the application of the MCG generally and specifically states that 1) D.D. presented himself in imminent danger to himself and others after May 8, 2019, 2) the application of the "serious harm" criteria to D.D. is inappropriate, 3) providers and supports were not available at a lower level of care, 4)

D.D. continued to have significant functional impairment in his abilities to participate in activities of daily living. (Doc. 53 at 6-10.)

Before assessing whether substantial evidence supported the decision to deny continued care based on MCG B-902-IP and reviewer analysis, the Court looks at Anthem's initial determination that D.D.'s inpatient admission was medically necessary through the MCG lens. It is undisputed that Anthem deemed KKI NBU treatment medically necessary as of May 1, 2019, based on KKI's authorization request and documentation supplied with it. In terms of guideline B-902-IP criteria, this meant that Anthem found the following Admission Guidelines satisfied:

> o Patient risk of severity of behavioral health disorder is appropriate to proposed level of care as indicated by **1 or more** of the following . . . :
>
>> ▪ Imminent danger to self for child or adolescent
>>
>> ▪ Imminent danger to others for child or adolescent
>>
>> ▪ Behavioral health disorder is present and appropriate for inpatient care with **ALL** of the following:
>>> • **Severe** Psychiatric, behavioral, or other comorbid conditions for child or adolescent
>>> • Severe dysfunction in daily living for child or adolescent
>
> + Treatment services at proposed level of care are indicated
> + Situation and expectations are appropriate for inpatient care for Child or adolescent

(AR 1021.)

In its initial denial letters, Anthem indicated D.D.'s hospital admission was found medically necessary because he was at a high risk of harm. (AR 228, 912, 927.) Because Anthem determines medical necessity pursuant to the guideline, it can be inferred that Anthem also found treatment services at the level of care provided by KKI in the NBU were indicated and "the situation and expectations were appropriate for inpatient care." (AR 1021.) For purposes of the MCG Admission Guidelines, "[s]ymptoms or conditions used to determine the appropriate treatment intensity should be due to the underlying behavioral diagnosis or represent factors that contribute to destabilization of the underlying diagnosis, and are acute in nature or represent a significant worsening over baseline." (AR 1024 n.B.) Thus, it can be inferred that Anthem found D.D.'s symptoms or conditions to be "acute in nature or represent a significant worsening over baseline." (AR 1021, 1024 n.B.) In medical terms, "acute" means "severe and sudden in onset." https://medlineplus.gov/ency/imagepates/18126.htm (last visited April 2, 2024). Because KKI's authorization request and preadmission providers did not suggest that D.D.'s symptoms or conditions were of "severe or sudden onset" but rather indicated that admission was sought because of dangerous behaviors that had significantly worsened over the preceding eight months (AR 241, 252, 255), it can be inferred that Anthem found admission to the NBU medically necessary because D.D.'s symptoms "represent[ed] a significant worsening over baseline" (AR 1024 n.B). Thus, the Court will proceed on the

premise that D.D. was being treated at KKI for problem behaviors that "represented a significant worsening over baseline." (*Id.*)

In guideline terms, medical necessity would be determined following admission pursuant to B-902-IP's "Recovery Course" and "Discharge Guidelines" provisions. Because Anthem asserts that Discharge Guidelines were satisfied when it denied continued coverage, the Court will not discuss "Recovery Course" considerations and will proceed with an analysis of whether substantial evidence supports Anthem's determination that continued treatment was not medically necessary because the relevant Discharge Guidelines were met after May 7, 2019. The Court focuses mainly on the criteria Anthem relies upon.

As relevant to this case, B-902-IP's Discharge Guidelines indicate that D.D. needed continuing inpatient care unless **all** of the following criteria were met:

1.  Risk status was acceptable as indicated by all of the following -

    a.  D.D.'s danger to himself or others was manageable because (i) he had an "Absence of Thoughts of . . . serious Harm to self or others" or (ii) his "Thoughts of suicide, homicide or serious Harm . . . [were] present but manageable at available lower level of care;

    b.  D.D. and his supports understood the follow-up treatment and crisis plan; and

    c.  Provider and supports were available at a lower level of care;

2.  D.D.'s functional status was acceptable as indicated by the following –

    a.  No essential function was significantly impaired; or

    b.  An essential function is impaired, but impairment is manageable at available

       lower level of care;

3.  Medical needs were absent or manageable at a lower level of care as indicated by

    absent or manageable adverse medication effects; and

4.  Treatment goals for the level of care were met.[13]

In conducting the following analysis, the Court agrees with Defendant's assertion

that Anthem's use of the MCG to determine medical necessity is appropriate. (*See* Doc. 57

at 2-3.) The Court agrees with Plaintiff's assertion that the MCG should "not be imposed

automatically" but should be used "'in the same manner as any other educational medium

and should not [be relied on] to the exclusion of [professionals and other persons using the

MCG] to the exclusion of their own professional judgment.'" (Doc. 53 at 4 (quoting

https://www.mcg.com/terms-of-use/).)  The Court also agrees that the MCG should "'be

---

[13] The Discharge Guidelines alternatively provide that "[c]ontinued inpatient care is generally needed until . . . inpatient care is no longer appropriate due to patient progress record . . . as indicated by . . . [l]ack of improvement indicates need for long-term custodial care." (AR 1022.) As will be discussed in detail later in the text, in the Peer Reviewer Final Report, the AMR reviewer answered "No" to the question "Is the proposed treatment medically necessary (can provision of the treatment, in whole or in part, reasonably be expected to be health beneficial for the patient and/or can withholding the treatment, in whole or in part, reasonably be expected to affect the patient's health adversely)?". (AR 938.) In explaining his answer, the reviewer conclusorily stated that "[t]he clinical information provided does not indicate that the service requested is . . . likely to be successful in treating the patient's symptoms." (*See* AR 938.) Although this statement aligns with the Discharge Guideline stating that "inpatient care [was] no longer appropriate due to patient progress record . . . as indicated by . . . [l]ack of improvement [which] indicates need for long-term custodial care" (AR 1022), this basis for finding continued treatment not medically necessary has never been asserted by Anthem and is not supported by the record. Anthem has never articulated that inpatient care was no longer appropriate because of lack of improvement. Rather, from the May 10, 2019, denial letter (AR 228) to the current litigation position (*see, e.g.*, Doc. 50 at 18-19), Anthem has consistently maintained that D.D.'s improvement rendered inpatient NBU care not medically necessary.

applied to individual patients on a case-by-case basis.'" (Doc. 53 at 5 (quoting *H.N. v. Regence Blue Shield*, Civ. A. No. 15-CV-1374 RAJ, 2016 WL 7426496, at *4 (W.D. Wash. Dec. 23, 2016)).

### 1. Absence of Thoughts of Serious Harm

Defendant argues in its summary judgment briefing that it properly concluded the "serious harm" criteria for discharge was met because the medical records establish that D.D. did not pose a risk of serious harm to himself or others and Plaintiff provides no evidence that D.D. posed such a risk as the term is defined for purposes of B-902-IP. (*See* Doc. 50 at 19; Doc. 57 at 4.) The Court considers this a post-hoc rationalization for Anthem's denial because the issue was not raised pre-litigation. *See supra* pp. 39-44.

In connection with this litigation, Defendant supplemented the Administrative Record, stating that the following definition applies to the term "serious harm" for purposes of B-902-IP: "Harm to self or another is considered serious if it has a substantial likelihood of causing death, disability, or major disfigurement." (Doc. 43 at 3, AR 1050.) Anthem's three denial letters expressed their assessment of D.D.'s risk of harm but did not define or characterize the referenced harm. *See, e.g., supra* p. 52.  No reviewer used the term "serious harm" or otherwise referenced any aspect of the definition in a rationale for denying coverage. Nothing in the AMR medical necessity evaluation supports an inference that the reviewer considered the harm definition proffered by Defendant or found that D.D. had an absence of thoughts of serious harm to himself or others such that the "[a]bsence of Thought of . . .

serious harm" aspect of B-902-IP's Discharge Guidelines risk assessment would be satisfied. Rather, as will be discussed in more detail below, the AMR reviewer used the term "imminent risk of harm" in the medical necessity analysis. (*See* AR 938.)

Further, if the Court were to *arguendo* consider Defendant's post-hoc argument regarding serious harm, the Court would find it unavailing. This is so because the fact that no reviewer used the term, any aspect of the proffered definition, or language found in the relevant Discharge Guidelines provision as a reason for finding that continuing care was not necessary strongly indicates that reviewing professionals did not consider this discharge criteria relevant to D.D. This assessment would be appropriate because the B-902-IP criteria is framed in terms of the patient's *thought process*, i.e., "Absence of Thoughts of . . . serious Harm to self or others" (*See* AR 1022) and the record establishes that D.D.s thought process regarding harm could not be ascertained. D.D. was non-verbal and therefore could not orally express his thoughts. He had some ability to express his wishes through non-verbal communication and the use of technical devices, but nothing in the record suggests that this limited communication ability extended to assessing complex thoughts such as thoughts of harm. These considerations indicate that a fair inference can be drawn that reviewing professionals did not consider the provision at issue applicable to whether continuing NBU for D.D. was medically necessary.[14]

---

[14] With the conclusion that substantial evidence does not support Anthem's determination that the B-902-IP guideline regarding the need for there to be an absence of thought of serious harm to self or to another was satisfied, the Court does not suggest that the harm related to D.D.'s problem behaviors could

This determination shows that substantial evidence does not support Defendant's current assertion that it correctly applied the Discharge Guideline provision which uses the term "serious harm." Defendant does not argue that an alternative standard was used and satisfied in this case. Therefore, the Court's finding that substantial evidence is lacking to support Defendant's application of the serious harm criteria indicates that substantial evidence does not support Anthem's basis for finding continuing care unnecessary which, in turn, means that Anthem's decision to deny benefits was arbitrary and capricious.

Though not necessary for the disposition of the pending motions, because the lack of support for Anthem's decision is apparent in additional respects, the Court will briefly consider other issues including the harm assessment contained in the "Peer Reviewer Final Report" and the B-902-IP Discharge Guidelines' medication management and treatment goal provisions.

### 2. AMR Reviewer Risk Assessment

---

not be considered "serious" as that term is defined in the MCG. Several aspects of the information contained in the medical records regarding D.D.'s problem behaviors indicate that the potential harm to those without protective gear and to those present during behavioral outbursts cannot be deemed as a matter of course not to create the possibility of death, disability, or major disfigurement. The same can be said for the potential harm to D.D. if he were not closely monitored and controlled. KKI staff had to wear protective equipment including double padded arm guards and padded gloves for protection and had to apply a padded helmet to prevent injuries. (AR 399.) D.D. was reportedly at risk to himself of concussion, retinal detachment, or severe injury from head banging, as well as elopement from caregivers into streets and attempts to get out of moving vehicles. (AR 244.) Records indicate that D.D. could become uncontrollable during his behavioral outbursts and the record states that, on more than one occasion, D.D. attempted to choke his caregiver in the midst of such an outburst. (AR 686, 691.) Given the variability of D.D.'s problem behaviors throughout the period for which records were provided, there is no indication that the potential harm associated with the behaviors changed after May 7, 2019.

As set out previously, the reviewer was asked to answer the following question: "Is the proposed treatment medically necessary (can provision of the treatment, in whole or in part, reasonably be expected to be health beneficial for the patient and/or can withholding treatment, in whole or in part, reasonably be expected to affect the patient's health adversely)?" (AR 938.) The reviewer answered "**No.**" (*Id.*) The reviewer first stated that the requested service (NBU stay "from 5/8/2019 forward") was not found to be medically necessary. (*Id.*) The reviewer then stated that "[t]he clinical information provided does not indicate that the service requested is . . . likely to be successful in treating the patient's symptoms." (*Id.*) The following standard was then identified: "[a]cute inpatient psychiatric level of care would be considered medically necessary when there is imminent risk of harm to self or others as indicated . . . when the patient has significant agitation and aggression, which is of acute onset and represents a clear change from baseline." (AR 938.)

The subsequent application of the standard is inadequate to independently provide substantial evidence for Anthem's medical necessity determination because it is merely a string of assertions unsupported by citation to the record and devoid of consideration of contrary argument and evidence. References to symptoms not relevant to D.D. such as suicidal ideation, homicidal ideation, psychosis, and mania (AR 938) do not necessarily undermine the analysis. However, the reviewer's conclusory assertions related to D.D.'s

baseline, ongoing symptoms and conditions, and management at a lower level of care need more than a conclusory sentence to be deemed evidentiary.[15] (*Id.*)

Notably, the standard used by the reviewer to determine medical necessity assesses symptoms differently from the similar Admission Guidelines provision, B-902-IP n.B. Whereas the MCG provision states that the appropriate level of care determination should be based on symptoms or conditions that "are acute in nature **or** represent a significant worsening over baseline" (AR 1024 (emphasis added)), the reviewer states that "[a]cute inpatient psychiatric level of care would be considered medically necessary when there is imminent risk of harm to self or others as indicated . . . when the patient has significant agitation and aggression, which is of acute onset **and** represents a clear change from baseline" (*id.* (emphasis added)). The distinction between conjunctive and disjunctive language matters here because, as discussed above, Anthem's initial medical necessity determination is aligned with "a significant worsening over baseline" but his symptoms were not assessed at that time to be acute in nature. Eliminating the need for acuity, as would be appropriate under the MCG disjunctive symptom assessment standard, the AMR reviewer's statement would read "[a]cute inpatient psychiatric level of care would be considered medically necessary when there is imminent risk of harm to self or others as indicated . . .

---

[15] Several assertions involve D.D.'s "baseline" but are of no evidentiary value because the Court cannot discern what is meant by the term in the given context. *See supra* p. 57 n.10.

when the patient has significant agitation and aggression, which . . . represents a clear change from baseline." (AR 938.)

The reviewer does not provide a specific citation for the standard asserted or indicate its broad acceptance in the context under consideration. (*Id.*) Given the circumstances, interpreting the reviewer's medical necessity finding through the MCG symptom-assessment lens would be appropriate if the reviewer's assessment were to be considered an alternative to the "serious harm" provision in the MCG.

The record strongly supports a conclusion that continued inpatient psychiatric care would be medically necessary for D.D. under this standard because "there is imminent risk of harm to self or others as indicated . . . when the patient has significant agitation and aggression, which . . . represents a clear change from baseline" (AR 938.) Abundant evidence of record supports the conclusion that there was "risk of harm" during the relevant period. With problem behaviors per day generally averaging between 105 and 130 but running as high as 157, *see supra* pp. 26-27, the risk of harm was "imminent." The risk of harm was due to D.D.'s documented "significant agitation and aggression." The agitation and aggression exhibited upon admission to KKI and thereafter had, by implication derived from B-902-IP Admission Guidelines discussed above, been determined to be "a significant worsening over baseline" which indicates "a clear change from baseline." Therefore, in the absence of evidence that D.D. improved before May 8, 2019, D.D. satisfied the AMR reviewer's standard for medical necessity for the service requested when that standard is

interpreted to be consistent with the disjunctive symptom evaluation consistent with B-902-IP Admission Guidelines,

In sum, the AMR reviewer's medical necessity evaluation as articulated is based on a questionable standard and conclusory findings that could not provide substantial evidence to support Anthem's benefits decision. If the standard identified were edited to be consistent with B-209-IP, evidence of record clearly supports a conclusion that continued treatment at KKI NBU was medically necessary.

### 3. Management of Medication Effects

To Plaintiff's assertion that Defendant erroneously concluded that no adverse side effects to medication that required continued hospitalization (*see, e.g.*, Doc. 38 at 15, 27). Defendant responds that its reviewers properly assessed the medication aspect of the Discharge Guidelines because "Plaintiff does not point to any adverse medication effects produced by the changes made to D.D.'s medications" (Doc. 50 at 24). Defendant's reliance on the reviewers is not warranted.

Dr. Allen noted that KKI NBU providers were working on stabilizing D.D.'s extremely low platelet count and were planning, with medication adjustments to regain stability in the count "in upcoming weeks." (AR 757.) Dr. Soliman spoke about medications only in very general terms. (*See* AR 778.) The AMR reviewer may have implied that the Discharge Guidelines criteria that "[a]dverse medication effects [be] absent or manageable" was satisfied with the assertions that D.D. had no problems with his medications. (AR 938.)

However, this assertion is not an indication that the reviewer properly assessed the record regarding medication management and the coordination of medication changes with behavior, something which Dr. Tierney and Dr. Schmidt discussed in detail.

As summarized in the KKI doctors' May 31, 2019, and July 9, 2019, letters (AR 225, 401-02) and supported by the record (including Dr. Allen's May 9, 2019, internal record notation (AR 757)), adjustment of D.D.'s medications was deemed necessary and the adjustment needed to be carefully correlated with D.D.'s behavior to determine appropriate dosing (AR 225, 401-02). This need was recognized by D.D.'s preadmission treating providers, Dr. Challman and Dr. Bordas. Dr. Challman stated the need for a prolonged inpatient stay (over four to six months or longer) with "medication trials, which will take time" and that "[i]t is imperative that medication trials take place in a setting that is safe for [D.D.] and his caregivers." (AR 251.) Dr. Bordas stated the need for "medication trials that will take time to show results" and expressed that "[i]t is imperative that when adjusting medications and trying new forms of therapy that this be conducted in an environment that is safe for both [D.D.] and his caregivers." (AR 255.)

No reviewer acknowledged or addressed the documented need for inpatient management of D.D.'s medications to facilitate correlation of medication and behavioral data and accomplish necessary adjustments. Therefore, the Court cannot conclude that substantial evidence supports Anthem's conclusion that the Discharge Guidelines

medication assessment criteria was met because D.D. had no ongoing medical conditions that required management at the KKI NBU level of care.

### 4. Treatment Goals Met

Regarding the final discharge criteria that treatment goals for the level of care are met, in its supporting brief Plaintiff maintains that acceptable discharge criteria had not been met as of May 8, 2019, for numerous reasons including the level of problem behaviors and risk of harm, the fact that KKI was still in the process of developing a behavior plan, and the recognition that medication changes would take two weeks to reach a steady state at which time the effects on behavioral changes could be evaluated. (Doc. 38 at 11.) Plaintiff quoted KKI treatment goals: "'the goals [for D.D.'s treatment] are to improve functioning so he will be able to participate in educational programming, and home and community life. Progress has been made in these efforts, but much more remains to be accomplished.'" (Doc. 38 at 11.)

Defendant disagrees that treatment goals had not been met, stating that

the treatment was initially authorized because D.D.'s self-injurious and aggressive behaviors were noted to be significantly more frequent and intense, such that D.D. posed a serious danger to himself and others. The record includes substantial evidence that D.D.'s condition after May 7, 2019, did not present serious risk of harm as to warrant continue [sic] acute inpatient care, and because his symptoms could have been managed at a lower level of care.

(Doc. 50 at 25-26.)

Although Defendant contends in its reply brief that Plaintiff did not rebut Defendant's argument that treatment goals had been met and, therefore waived the issue (Doc. 57 at 8),

the Court disagrees that Plaintiff waived the issue because it was addressed in his reply brief. Plaintiff stated that

> D.D. continued to meet the MCG for admission after May 8, 2019 as he presented imminent danger to himself and others. . . . After only one week of treatment, D.D. and others remained at risk for serious injury as the treatment had not been completed to the point where it could be successfully implemented. ([AR] 226). As set forth in KKI's second level appeal dated May 31, 2019, even after one month of treatment,
>
>> [b]ased on [D.D.'s] history and [KKI's] experience with similar children, successful transition to his home and community will require: 1) continued treatment in-hospital, 2) additional intensive treating to ensure caregivers deliver the treatment consistently and with good consistency and with good integrity, and 3) generalization of the treatment to ensure lasing effects of the treatment in the natural environment."
>
> ([AR]226).

(Doc. 53 at 5-6.)

Defendant's argument on the issue is merely conclusory and, for reasons previously discussed, is undermined by the identification of a lack of "serious harm" as the basis for its assessment. Further, as set out above, the AMR reviewer conclusorily stated that "[t]he clinical information provided does not indicate that the service requested is . . . likely to be successful in treating the patient's symptoms." (*See* AR 938.) The reviewer did not reconcile the reasons for D.D.'s admission (which recognized medical necessity at the level of care requested) and the stated treatment goals (which explained the continuum of evolving treatment) with the denial of additional care. The reviewer did not address the treating doctors' extensive assessment of D.D.'s need for continued care (which was consistent with

KKI's Authorization Request and his preadmission behavioral status) and the likely success of the planned treatment. (*See* AR 222-27, 397-404.) As discussed previously Anthem reviewers did not provide a basis for their conclusions that discharge was warranted. Thus, the Court cannot conclude that substantial evidence supports Anthem's assertion that the B-902-IP guideline regarding the need for continuing treatment was satisfied.

For the foregoing reasons, the Court concludes that substantial evidence does not support a conclusion that B-902-IP's Discharge Guidelines were met or that the record supports the conclusion that D.D.'s continued care at KKI was not medically necessary under the terms of the Plan.

Given the Court's conclusion that substantial evidence does not support Anthem's medical necessity determination and the previous conclusion that several procedural anomalies suggest that Anthem's denial was an abuse of discretion, the Court concludes that Anthem's decision was arbitrary and capricious. Therefore, the Court will grant Plaintiff's summary judgment motion (Doc. 33) and deny Defendant's motion (Doc. 45).

## C. Remedy

In *Miller*, after determining that the plan administrator's decision to terminate benefits was arbitrary and capricious, the Circuit Court continued to the next step of considering the proper remedy, i.e., whether the case should be remanded to the administrator or the Court should order an award of benefits. 632 F.3d at 856. Here, the parties do not address this issue. Rather, Plaintiff requests that the Court require Defendant to cover the cost of D.D.'s

treatment at KKI's NBU program from May 8, 2019, to October 24, 2019, in the amount of

$459,318, *see supra* p. 2, and Defendant "disputes that Plaintiff is entitled to any relief"

(Doc. 50 at 37). Defendant also asserts that, "should he establish that Anthem's Benefits

Decision was arbitrary and capricious," "Plaintiff erroneously demands that . . . he is entitled

to the full costs and expenses of treatment . . . from May 8, 2019 to October 24, 2019." (*Id*.)

Defendant bases this assertion on numerous grounds: 1) Plaintiff failed to obtain pre-

authorization for D.D.'s hospitalization anytime after July 7, 2019; 2) Plaintiff failed to

exhaust administrative remedies for dates of service after July 7, 2019; and 3) even if

Plaintiff could recover, he is only entitled to allowable charges. (*Id.* at 38-40.)

      The Court takes the parties' respective positions as an indication that Defendant

does not contend that remand, rather than an award of benefits, is the appropriate remedy

for Anthem's arbitrary and capricious denial of benefits. For the reasons discussed below,

the Court finds that this remedy is consistent with relevant caselaw.

      *Miller* considered the question of when an award of benefits rather than remand was

the appropriate remedy for a finding that a plan administrator's decision to terminate

benefits was arbitrary and capricious. 632 F.3d at 856. *Miller* noted that other courts

addressing the question of appropriate remedy "have determined that retroactive

reinstatement of a claimant's benefits is the proper remedy when the administrator's

termination decision was unreasonable." *Id.* (listing cases).

      In deciding whether to remand to the plan administrator or reinstate benefits, we
      note that it is important to consider the status quo prior to the unlawful denial or

termination. *See Hackett [v. Xerox Corp. Lon-Term Disability Income Plan*, 315 F.3d 771, 776 (7th Cir. 2003)]. As such, an important distinction emerges between an initial denial of benefits and a termination of benefits after they were already awarded. In a situation where benefits are improperly denied at the outset, it is appropriate to remand to the administrator for full consideration of whether the claimant is disabled. To restore the status quo, the claimant would be entitled to have the plan administrator reevaluate the case using reasonable discretion. In the termination context, however, a finding that a decision was arbitrary and capricious means that the administrator terminated the claimant's benefits unlawfully. Accordingly, benefits should be reinstated to restore the status quo.

*Miller*, 632 F.3d at 856–57. Applying these legal principles, *Miller* concluded that the defendant abused its discretion in terminating the plaintiff's benefits and, therefore, retroactive reinstatement of his benefits from the date of termination was necessary. *Id.*

As discussed above, this case is somewhat of a hybrid because Anthem's decision was neither a termination of benefits which had been approved without an end date nor an initial assessment of medical necessity. Rather, Anthem's denials were in response to Plaintiff's requests for *continued* hospitalization based on *continuing* medical necessity. These circumstances are more akin to a termination than an initial determination in that Defendant had made a determination that treatment at KKI's MBU was medically necessary for an initial period and, for subsequent periods, looked at medical necessity from the Discharge Guidelines perspective which present the question of when "*[c]ontinued* inpatient care [is] generally needed" and when it is "no longer necessary" (AR 1022 (emphasis added)). Thus, the request for continued care essentially entailed a reevaluation of the initial determination. Further, the Court's conclusion that substantial evidence did not support

Anthem's denial, based in part on the finding that evidence did not show that D.D.'s condition materially changed from May 1, 2019, to May 8, 2019, means, in Discharge Guidelines terms, that Anthem's determination regarding D.D.'s *continuing* care was unreasonable--a situation more like a termination of benefits than an initial determination. In *Miller* terms, the "status quo" before the denial was that D.D. was receiving care based on a determination of medical necessity. From this perspective, an award of benefits is warranted.

This determination is consistent with, but not dependent on, other cases wherein the court considered the plan administrator's denial of the plaintiff's request to continue inpatient mental health treatment in circumstances very similar to those presented here. *Sibley v. Priority Health*, Civ. A. No. 1:19-cv-704, 2021 WL 5019035 (W.D. Mich. Aug. 3, 2021) *Report and Recommendation adopted sub nom. Sibley o.b.o. J.S. v. Priority Health,* No. 1:19-CV-704, 2021 WL 4304715 (W.D. Mich. Sept. 22, 2021), was decided in the Sixth Circuit under a standard similar to that articulated in *Miller*: "'where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which [she] was clearly entitled, the appropriate remedy generally is remand to the plan administrator,'" *id.* at *8 (quoting *Shaw v. AT & T Umbrella Ben. Plan No. 1,* 795 F.3d 538, 551 6th Cir. 2015)). Under a *de novo* standard of review, *Sibley* concluded that the plaintiff was entitled to an award of benefits beyond the five-month stay approved because the defendant's denial of coverage for an extended stay was improper and noted that the

same decision would be warranted under an arbitrary and capricious standard of review. *Id.* *6, 8. Because the court did not have sufficient information to determine the appropriate amount of the award, the matter was remanded for further proceedings. *Id.* at *8. Notably, the plaintiff in *Sibley* was a non-verbal young woman who suffered from Autism Spectrum Disorder, Obsessive Compulsive Disorder, Anxiety, and Intellectual Disability who was being treated at KKI's NBU. *Id.* at *1.

In *D. K. v. United Behavioral Health*, 67 F.4th 1224, 1243–44 (10th Cir. 2023), *cert. denied*, No. 23-586, 2024 WL 674755 (U.S. Feb. 20, 2024), the Tenth Circuit considered the plan administrator's appeal of the district court's entry of summary judgment in favor of the plaintiffs, the parents of a minor beneficiary who sued to recover for a violation of fiduciary duties by the plan administrator based on failure to provide a full and fair review of a claim for medical benefits for the minor's extended stay at a residential treatment center beyond the initial three-month period. Reviewing the denial under the arbitrary and capricious standard, the Circuit Court upheld the award of benefits, providing a detailed explanation for its reasons for doing so:

> A court may remand for further administrative review if it determines the administrator's flawed handling could be cured by a renewed evaluation to address, for example, a "fail[ure] to make adequate findings or to explain adequately the grounds for a decision." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288 (10th Cir. 2002). *See also Rekstad v. U.S. Bancorp,* 451 F.3d 1114, 1121-22 (10th Cir. 2006) (remanding for plan administrator to examine relevant evidence). By contrast, a court may award benefits when the record shows that benefits should clearly have been awarded by the administrator. *See Weber v. GE Grp. Life. Assurance Co.*, 541 F.3d 1002, 1015 (10th Cir. 2008). That is not the only instance in which a court may award benefits. If a

plan administrator's actions were clearly arbitrary and capricious, then remand is unnecessary, and a reviewing court may award benefits. *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175-76 (10th Cir. 2006). Other circuits have similarly found remand unnecessary for procedural flaws. As the Second Circuit explained, remand to an insurer is not appropriate if it "serve[s] primarily to give the defendants an opportunity to retool a defective [appeals] system." *Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 648 (2d Cir. 2002). The Ninth Circuit has expressed concern with giving an additional "bite at the apple" to ERISA administrators acting unjustly. *See Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001).

In considering if such a rule is appropriate here, we consider the function of judicial review for ERISA administrators. The Supreme Court has reiterated that judicial deference to ERISA plan administrators is premised on their fiduciary roles. *See, e.g., Varity Corp. v. Howe*, 516 U.S. 489, 506, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). ERISA requires fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104. When the administrator's actions or structure threaten their ability to act as a proper fiduciary, the Court has given administrators' decisions less deference. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 107-09, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (disallowing the arbitrary and capricious standard of review when there is a possible conflict of interest for the administrator); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 118, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) (disallowing deferential review when considering the specific facts of the case). When Congress "careful[ly] balance[ed] the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans," *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), it did not give administrators unlimited freedom to act improperly towards claimants.

We conclude that the district court did not abuse its discretion in declining to remand. Considering the administrator's clear and repeated procedural errors in denying this claim, it would be contrary to ERISA fiduciary principles to mandate a remand and provide an additional "bite at the apple."

*D. K.*, 67 F.4th at 1243–44.

Recognizing that the Tenth Circuit standard articulated in *D.K.* is broader than the

Third Circuit standard set out in *Miller*, *D.K.'s* reasons for finding an award of benefits

appropriate resonate here. As in *D.K.*, the Court has found "clear and repeated procedural

errors in denying this claim," and, therefore, to mandate a remand and "provide an

additional 'bite at the apple" would be contrary to ERISA fiduciary principles under which

"the administrator owes a special duty of loyalty to the plan beneficiaries." *Glenn,* 554 U.S.

at 111.

As stated above, this observation is supportive of, but not central to, the Court's

determination that an award of benefits is the appropriate remedy for Anthem's denial of

Plaintiff's request for continuing hospitalization. Before deciding what that award should be,

the Court will consider Defendant's arguments on the limitation of damages.

## D. **Damages**

Defendant first argues that Plaintiff is not entitled to the damages sought because he

did not submit records to obtain pre-authorization for any date of service after July 7, 2019,

and, therefore, the Court cannot make a determination as to the July 8, 2019, to October 24,

2019, (D.D.'s discharge date) period since the record contains no evidence as to these

dates upon which to decide medical necessity. (Doc. 50 at 38-39.)  Defendant next argues

that Plaintiff did not exhaust administrative remedies for the post-July 7th period as required

under ERISA. (*Id.* at 39 (citations omitted).) Finally, Defendant argues that, even if Plaintiff

could recover, he is only entitled to allowable charges and not the charges billed by the provider. (Doc. 50 at 40.)

Plaintiff responds that Defendant unequivocally denied benefits for future dates, i.e., "from May 8, 2019 *forward*." (Doc. 53 at 13 (citing AR 937, 405-06, 1012).)  Plaintiff also argues that he is excused from exhaustion in this case because it would be futile to do so (*id.* (citing *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 916 (3d Cir. 1990)), and several factors in the relevant inquiry weigh in his favor (*id.* at 13-14 (citing *Harrow v. Prudential Ins. Co. of America*, 29 F.3d 249-50 (3d Cir. 2002)). Plaintiff does not specifically address Defendant's argument that he is entitled to only the allowable amount under the Plan and not the charges billed by the provider. However, Plaintiff continues to assert his entitlement to $459,318. (*See* Doc. 53 at 14.)

In its reply brief, Defendant asserts that, because Plaintiff did not respond to its argument that he is not entitled to the damages sought given his failure to submit records to obtain pre-authorization for any date of service after July 7, 2019, Plaintiff has waived the argument. (Doc. 57 at 16 (citing *Pesacov v. Unum Life Ins. Co. of Am.*, 463 F. Supp. 3d 571, 577 (E.D. Pa. 2020)).) Defendant also contends that, if not waived, Plaintiff has not met his burden of showing by a preponderance of the evidence that continued treatment after July 7, 2019, was medically necessary. *Id.* Defendant also maintains that Plaintiff failed to make the required "'clear and positive showing' of futility" necessary to overcome the exhaustion requirement.  (Doc. 57 at 18.)

The Court does not deem Defendant's argument regarding the effect of Plaintiff's

failure to obtain pre-authorization waived in that Plaintiff's response that Defendant's refusal

to pay for D.D.'s treatment "from May 8, 2019 forward . . . rendered futile any further

submission of claims" (Doc. 53 at 13 (citing AR 937, 405-06, 1012)) can be interpreted to

encompass the submission of records and request for pre-authorization.

The parties agree that the following factors are relevant to the futility determination.

(*See* Doc. 53 at 13, Doc. 57 at 17-18.) *Harrow* stated

> [w]hether to excuse exhaustion on futility grounds rests upon weighing several factors, including: (1) whether plaintiff diligently pursued administrative relief; (2) whether plaintiff acted reasonably in seeking immediate judicial review under the circumstances; (3) existence of a fixed policy denying benefits; (4) failure of the insurance company to comply with its own internal administrative procedures; and (5) testimony of plan administrators that any administrative appeal was futile. Of course, all factors may not weigh equally. *See Berger,* 911 F.2d at 916–17; *Metz v. United Counties Bancorp.,* 61 F.Supp.2d 364, 383–84 (D.N.J.1999) (relying on *Berger*).

*Harrow*, 279 F.3d at 250. *Harrow* approvingly cited *Fallick v. Nationwide Mut. Ins. Co.,* 162

F.3d 410, 419 (6th Cir.1998), for its conclusion that "[a] plaintiff must show that it is certain

that his claim will be denied on appeal, not merely that he doubts that an appeal will result in

a different decision." *Id.*

Regarding the phrasing of the denials, Plaintiff is correct that Anthem's treatment

denials were framed in terms of a denial "from May 8, 2019 forward." *See supra*. However, it

is also undisputed that Plaintiff did not submit treatment records after July 7, 2019.

Therefore, Anthem's description of the time period at issue and the AMR reviewer's

September 3, 2019, use of the same descriptive, *see supra*, render the meaning of "from May 8, 2019 forward" ambiguous. In these circumstances, the Court cannot conclude that the phrasing of the denials does not show the "existence of a fixed policy denying benefits." 279 F.3d at 250. Therefore, this factor weighs somewhat in favor of Plaintiff.

The Court finds that Plaintiff "diligently pursued administrative relief" in that prompt appeals were filed and independent review was timely requested. *Id.* Further, KKI letters supporting the medical necessity of continued treatment contained extensive factual detail and the clinical/medical foundations for the requests. *See supra.* Finding no problem with Plaintiff's reasonableness in seeking judicial review, the Court finds two of five *Harrow* factors strongly weigh in favor of finding futility and one weighs somewhat in favor. Therefore, on balance, the Court concludes that *Harrow* supports a finding of futility in this case.

The Court is not persuaded otherwise by Defendant's argument that

if D.D.'s medical records for dates of service after July 7, 2019 showed that his behavior was such that he posed a serious risk of harm, then his treatment at KKI would have been Medically Necessary and Anthem's Benefits Decision would have been overturned. Thus, Plaintiff cannot demonstrate it was *certain* that Anthem would deny benefits for dates after July 7, 2019.

(Doc. 57 at 18.) The Court concludes that Anthem's consideration of the medical records and strict adherence to the Discharge Guidelines "serious harm" component indicate that Anthem would have continued to improperly find a lack of serious harm unless D.D.'s condition significantly worsened after July 7, 2019. This conclusion is based on the Court's

earlier determination that application of the MCG's serious harm standard was inappropriate in this case for several reasons, including the lack of support for Defendant's litigation position in any reviewers' analysis contained in the Administrative Record and for the further reason that the relevant criteria in the Discharge Guidelines does not apply to an individual like D.D. who is unable to communicate *thoughts* of harm. This, in turn, means that Defendant would have continued to apply an inappropriate "medical necessity" standard for the duration of D.D.'s hospitalization at KKI and Plaintiff was not on notice to address the issue because the "serious harm" argument is a litigation position which was never mentioned in a denial.

Another consideration supporting Plaintiff's certainty that future claims would be denied is the fact that Anthem's denials never acknowledged the variability of D.D.'s problem behaviors and, even with a spike from an average of 82 problem behaviors per day from May 31, 2019, through June 7, 2019, to an average of 157.9 problem behaviors per day from June 18, 2019, through June 27, 2019, *see supra* p. 28, Anthem did not find continued care medically necessary for even a brief period.[16] Nor did Anthem acknowledge that D.D. engaged in behavior that would meet even Defendant's strict interpretation of the definition proffered, i.e., the documentation that D.D. attempted to choke his caregiver

---

[16] The Court recognizes that D.D.'s problem behaviors for the next period, June 28, 2019, through July 4, 2019, decreased to an average of 68.2 problem behaviors per day, *see supra* p. 28, but, without demonstrated stabilization, this signifies variability rather than lack of medical necessity.

during an outburst on June 24, 2019, (AR 686) and on June 25, 2019, (AR 691). Such conduct, if unable to be restrained, would have had a "substantial likelihood of causing death or disability" (AR 1050) and outside of the tightly controlled setting of the NBU there would be a far less likelihood of the ability to restrain.

Turning now to the appropriate award, the Court's conclusion that the *Harrow* factors weigh in favor of finding futility does not mean that Plaintiff is entitled to the award requested. First, the Court unequivocally awards benefits for the period of May 8, 2019, to July 7, 2019. Second, because Defendant asserts that there is a discrepancy between the amount billed by KKI and the amount allowed under the Plan without providing specific figures, and because Plaintiff does not argue that he is entitled to more than that allowable under the plan, the matter will be remanded to the Plan Administrator solely for the purpose of making the mathematical calculation of the amount that would have been paid if Anthem had, in the first instance, awarded benefits for May 8, 2019, through July 7, 2019.[17] The payment of the amount calculated for this period is not discretionary.

Concerning D.D.'s hospitalization from July 8, 2019, through October 24, 2019, the Court does not find any basis in the record to conclude that medical necessity ended on July 7, 2019, given the instability of Plaintiff's condition in the preceding few weeks, *see supra* pp. 27-28, the nature of his problem behaviors, which included two incidents of

---

[17] Because Plaintiff does not provide a basis to conclude that he is entitled to more than the amount recoverable under the Plan (*see* Doc. 53 at 14), the amount owed for May 8, 2019, through July 7, 2019, shall be predicated on the amount allowable under the Plan.

attempted choking on June 24, 2019, and June 25, 2019, (*see* AR 686, 691), and June 27, 2019, meeting notes which include the KKI Treatment Team's summary assessment:

> ➤ 24 hour treatment went out on the unit about 7 days ago.

> ➤ Initially [D.D.] was responding very well with treatment in place. He had very low rates of problem behavior per hour.

> ➤ He was following some irregular sleep patterns. He was waking up well before his wake up time. When he woke up he would engage in fecal play, get out of bed, and become very disruptive.

> ➤ Spoke with psychiatrist and she adjusted his meds to target his sleep. After this med change his problem behavior increased.

> ➤ The team is adjusting those issues and working with psychiatry.

> ➤ They've seen a spike to about 20 responses per hour. His mood is irregular, and he is starting to cry and whine.

> ➤ Lately, he has become fixated on things, especially his treatment bin.

> ➤ As of now, not sure if his discharge will be in July.

(AR. 698-99.)

However, because this assessment is based on what preceded the July 8, 2019, to October 24, 2019, period, the Court can only say that evidence indicates that D.D. was entitled to coverage for *some* period beyond July 7, 2019. Determining the extent to which coverage should have been extended requires a further determination by the Plan Administrator with such supplementations to the Administrative Record as the parties deem necessary. Therefore, if Plaintiff continues to seek reimbursement for the latter period,

Plaintiff must submit relevant records for Anthem's review and Anthem must expeditiously conduct a medical necessity evaluation consistent with this decision.

## D. <u>Attorney Fees and Costs</u>

Plaintiff also requests reimbursement for the reasonable attorneys' fees and costs incurred in this action. An award of attorneys' fees is discretionary under ERISA as explained in *McPherson v. Employees' Pension Plan of Am. Re-Ins. Co.*, 33 F.3d 253 (3d Cir. 1994):

> Attorneys' fees may be awarded to prevailing parties in actions brought under the Employee Retirement Income Security Act of 1974 ("ERISA"). The statute, however, provides no standard for a fee award, stating only that "the court in its discretion may allow a reasonable attorney's fee and costs of action." 29 U.S.C. § 1132(g)(1). To guide district courts as they exercise their discretion in connection with such fee applications, we have set forth five factors that must be considered:
>
>> (1) the offending parties' culpability or bad faith;
>>
>> (2) the ability of the offending parties to satisfy an award of attorneys' fees;
>>
>> (3) the deterrent effect of an award of attorneys' fees against the offending parties;
>>
>> (4) the benefit conferred on members of the pension plan as a whole; and
>>
>> (5) the relative merits of the parties' position.
>
> *Ursic v. Bethlehem Mines,* 719 F.2d 670, 673 (3d Cir.1983).[1] We have further instructed that there is no presumption that a successful plaintiff in an ERISA suit should receive an award in the absence of exceptional circumstances. *Ellison v. Shenango, Inc. Pension Bd.,* 956 F.2d 1268, 1273 (3d Cir.1992). Finally, we have directed that a district court, when ruling on an application for

attorneys' fees in an ERISA case, should articulate its analysis and conclusions as it considers each of the five *Ursic* factors. *Anthuis v. Colt Indus. Operating Corp.,* 971 F.2d 999, 1012 (3d Cir.1992).

*McPherson*, 33 F.3d at 254; *see also Askew v. Reppert*, Civ. A. No. 5:11-cv-04003, 2020 WL 4050605 (E.D. Pa. July 17, 2020) (applying *McPherson* discretionary standard).

Plaintiff may very well be entitled to such relief, see 29 U.SC. § 1132(g), but this issue has not been properly briefed. Therefore, this request will be denied without prejudice and subject to consideration upon receipt of a motion for attorneys' fees filed and fully briefed in compliance with the Local Rules of Court of the Middle District of Pennsylvania.

## V. CONCLUSION

For the foregoing reasons, the Court will grant Plaintiff's Motion for Summary Judgment (Doc. 33) in part and deny Defendant's Cross Motion for Summary Judgment (Doc. 45). This matter will be remanded to the Plan Administrator for the calculation and payment of benefits for the period of May 8, 2019, through July 7, 2019, and, upon Plaintiff's submission of additional records, for evaluation of benefits consistent with this Memorandum Opinion for the period of July 8, 2019, through October 24, 2019, and appropriate payment of benefits for that period. Plaintiff's request for attorneys' fees and costs will be denied without prejudice. A separate Order follows.

Robert D. Mariani
United States District Judge

95